Jimmie B. **BURROUGHS**, Jr., Plaintiff,

v.

**MARATHON OIL COMPANY, a Foreign Corporation, Defendant.**

No. 5–71273.

United States District Court,
E. D. Michigan, S. D.

Feb. 28, 1978.

---

Phillip Green, Detroit, Mich., for plaintiff.

Robert M. Vercruysse and Chester Kasiborski, Jr., Detroit, Mich., John M. Miller, Findlay, Ohio, for defendant.

## MEMORANDUM OPINION

KEITH, Circuit Judge, Sitting by Designation.

Plaintiff Jimmie B. Burroughs, Jr., a Black man, brought this action alleging that Defendant Marathon Oil Company violated the provisions of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e, *et seq,* when defendant demoted him from the position of pumper to utilityman at defendant's Detroit Refinery. All procedural prerequisites under Title VII were met and the case came on for trial before this court sitting without a jury. In this action, plaintiff sought reinstatement to the position of pumper, differential back pay in the amount of $7,195.36, costs and attorney fees.[1] It is the opinion of this court, for the reasons stated below, that the relief plaintiff seeks must be denied.

## FINDINGS OF FACT

Plaintiff has been in the continuous employ of Marathon Oil Company at its Detroit Refinery since January 19, 1968. At that time he was hired as a utilityman. On July 26, 1969, plaintiff was classified as a pumper helper, which position he had to bid into and then demonstrate proficiency during a probationary period before becoming a full-fledged pumper.[2] However, on May 1, 1970, plaintiff and other pumper helpers were automatically reclassified upward to

---

1. Since on or about April 10, 1977, plaintiff has been employed by defendant in a position equivalent to that from which he was demoted and no longer seeks equitable relief in the form of reinstatement. Plaintiff's Proposed Findings of Fact and Conclusions of Law, at 3.

2. The pumper position generally involves pumping petroleum products to and from storage tanks and tank cars through pipes and valves.

the pumper position as a result of a collective bargaining agreement entered into between Marathon Oil and the Union.[3] It was stipulated that during plaintiff's entire tenure as a pumper he was the only Black man so classified, and he worked solely under the supervision of white men.

After entering the pumping department, plaintiff was involved in a number of operational errors. Although defendant contended that plaintiff committed ten operational errors, this court finds that plaintiff committed five misoperations, as plaintiff admitted, all of which involved tank overflows:

1. On September 29, 1969, plaintiff overflowed Tank 104 of No. 2 fuel for approximately two hours at 2,500 barrels per hour.
2. On November 25, 1970, plaintiff overflowed Tank 51.
3. On June 8, 1971, plaintiff overflowed Tank 1.
4. On November 12, 1971, plaintiff overflowed Tank 175.
5. On October 26, 1973, plaintiff overflowed Tank 14.[4]

Misoperations such as tank overflows are both dangerous and costly. During the period of time in which plaintiff was employed in the pumping department, the other fifteen pumpers committed a total of only eight misoperations. Plaintiff did not deny being forgetful and inattentive while he was a pumper. Plaintiff was warned about his performance in the pumping department on numerous occasions and was given both oral and written advice and suggestions by defendant on how to improve his performance on the job.

Plaintiff did not work as a pumper from December, 1971, through May, 1972, during which time he was on sick leave due to a hernia operation. Prior to this sick leave, defendant placed plaintiff on light duty so that plaintiff was able to delay his operation and meet his employment anniversary date in order to receive sick leave benefits to which he otherwise would not have been entitled. Defendant further placed plaintiff on light duty following his operation and gave him retraining instructions upon his return to the pumping department. While on light duty, defendant continued to pay plaintiff at his pumper's salary although this was not required of defendant under the collective bargaining agreement.[5]

Despite plaintiff's misoperations, defendant kept plaintiff in the position of pumper for several years, but his performance did not substantially improve. On December 18, 1973, following his last tank overflow, plaintiff's performance record was discussed with him in the presence of union representatives. At that meeting, plaintiff was given the opportunity to explain his

---

3. The employees of Marathon Oil are represented by the Cylinder Gas Chemical Petroleum Auto Service and Accessory Drivers, Maintenance Mechanics Helpers and Inside Employees Local Union No. 283, an affiliate of the International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America.

4. The other operational errors which defendant contended plaintiff was responsible for were:
 1. May 4, 1971, failure to follow procedure for unloading a butane tank car.
 2. June 19, 1971, failure to get clearance before pumping propylene through pipeline from Detroit Refinery to Woodhaven, Michigan.
 3. August 17, 1971, pumped incorrect product into incorrect tank because of misalignment of valves.
 4. July 20, 1972, failure to check gauge on Tank 108 and failure to recognize misalignment.

5. August 20, 1973, valve misalignment resulting in contaminated product.

5. The relevant clause of the contract is contained in Article XVIII (Special Provisions), Section 2—Assignment to Limited Duties. It provides:

 In cases where the employee becomes incapable of performing his work through accident, illness or other causes, the Employer will, if reasonably possible, without resort to makework or depriving another employee, provide such work as the employee is capable of performing at the rate applicable to the work performed. When the employee is returned to his former duties his seniority shall not be affected by reason of the temporary change of classification; if questioned, this will become a subject of the grievance procedure.

record in the pumping department. At plaintiff's request, no action was taken by defendant pending further investigation into disputed incidents and further reconsideration of his record. Finally, on December 28, 1973, defendant demoted plaintiff from pumper to utilityman in the maintenance department, effective January 2, 1974, because plaintiff was unable to successfully perform as a pumper.

Plaintiff contended that defendant discriminated against him by demoting him and thus subjecting him to a decrease in salary, whereas a white employee, charged with operational errors, received a disciplinary suspension which permitted him to return to the pumper position following the suspension period. Plaintiff attempts to draw a comparison between himself and Frederick Schumacher who committed various operational errors after July 1975, and was given a disciplinary suspension in 1976. This court finds that the situations between plaintiff and Mr. Schumacher were not similar. Mr. Schumacher worked as an extraman with fifty percent of his duties in the pumping department from May 1957, through October 1971. During this fourteen-year period, Mr. Schumacher committed only three misoperations. In October 1971, Mr. Schumacher became a full-time pumper and committed no operational errors until July 1975. Defendant gave Mr. Schumacher a disciplinary suspension in the belief that while he had proven himself a capable and satisfactory employee of the pumping department for eighteen years, he was experiencing an attitude problem which temporary suspension might correct. Conversely, during plaintiff's tenure in the pumping department, his periods of error-free performance were minimal and he never performed satisfactorily.

Plaintiff's claim of racial discrimination was the subject of a grievance proceeding under the collective bargaining agreement. An arbitration hearing was conducted in May and June of 1974, and on August 8, 1974, Arbitrator Leon J. Herman denied plaintiff's grievance on the basis of his finding that plaintiff had not been discriminated against because of his race. This court gives some weight to the arbitrator's decision under the guidelines noted in *Alexander v. Gardner-Denver Co.*, 415 U.S. 36, 60, n. 21, 94 S.Ct. 1011, 1025, 39 L.Ed.2d 147 (1974):

> We adopt no standards as to the weight to be accorded an arbitral decision, since this must be determined in the court's discretion with regard to the facts and circumstances of each case. Relevant factors include the existence of provisions in the collective-bargaining agreement that conform substantially with Title VII, the degree of procedural fairness in the arbitral forum, adequacy of the record with respect to the issue of discrimination, and the special competence of particular arbitrators. Where an arbitral determination gives full consideration to an employee's Title VII rights, a court may properly accord it great weight. This is especially true where the issue is solely one of fact, specifically addressed by the parties and decided by the arbitrator on the basis of an adequate record. But courts should ever be mindful that Congress, in enacting Title VII, thought it necessary to provide a judicial forum for the ultimate resolution of discriminatory employment claims. It is the duty of courts to assure the full availability of this forum.

This court finds that the provisions in the collective bargaining agreement between defendant and Teamsters Local Union No. 283 parallel the language of Title VII,[6] that

**6.** The relevant collective bargaining agreement clause prohibiting discriminatory actions by the defendant is contained in Article I, Section 4—Non-Discrimination. It provides in pertinent part:

> The Employer warrants that no person shall be refused employment, nor in any manner be discriminated against because of membership or non-membership in any labor organization, or because of race, creed, color, sex or national origin.
> The Union warrants that its practices and policies do not discriminate for or against any person on the grounds of race, creed, color, sex or national origin; and, further, that it will affirmatively cooperate in the implementation of the policy set out in the above paragraph.

plaintiff was given procedural fairness in the arbitral forum, that he was represented by competent counsel and was given full opportunity to present his case and cross-examine witnesses, that the issue of discrimination was a central issue in the arbitration proceedings, and that the arbitrator's decision fully and competently dealt with the issue of discrimination.

Although it appears that plaintiff initially sought employment with defendant in 1964, and that he was finally hired in 1968, defendant has consistently increased its minority work force during the period in question. From 1968, the year in which plaintiff was hired, through 1976, the percentage of minority employees among defendant's hourly work force increased from 9.5 percent to 23.3 percent. During the same period, 123 of the 235 hourly employees hired by defendant, or 52.3 percent, were minority employees. Through 1973, the date plaintiff was demoted, the figures show that defendant's minority work force increased to 13.7 percent, and that 62 of the 155 hourly employees hired were minority employees.

Following his demotion, various job openings existed which plaintiff, by his seniority, was qualified to bid on. He declined to do so and so failed to mitigate his damages.

## CONCLUSIONS OF LAW

Plaintiff is an employee and defendant is an employer within the meaning of Title VII. 42 U.S.C. 2000e. All procedural prerequisites required under Title VII have been met and plaintiff properly invoked this court's jurisdiction pursuant to 28 U.S.C. §§ 1343(3) and (4), and 42 U.S.C. § 2000e–5(f)(3). For the reasons which here follow, this court determines that defendant did not violate any rights secured to plaintiff pursuant to 42 U.S.C. §§ 2000e, *et seq.*

■ In a Title VII trial, the plaintiff has the burden of establishing a *prima facie* case of racial discrimination. The burden shifts to the employer to demonstrate some legitimate, nondiscriminatory reason for the demotion. The plaintiff then has the opportunity to show that the reasons given by the employer are merely pretext for a racially discriminatory decision. *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973); *Capers v. Long Island Railroad,* 429 F.Supp. 1359 (S.D.N.Y.1977).

■ Plaintiff here has failed to carry his burden of establishing a *prima facie* case of racial discrimination. First, although plaintiff was retained by defendant as a pumper for several years, and despite numerous instances of advice and instruction, he never satisfactorily performed that job and hence he failed to establish his qualifications for his retention of the pumper job. *McDonnell Douglas Corp. v. Green, supra,* 411 U.S., at 802, 93 S.Ct. 1817. Plaintiff was responsible for no fewer than five operational overflows which he admitted were due to his forgetfulness or inattentiveness. Second, plaintiff has not proven that the treatment accorded him as opposed to any white employee was disparate. Plaintiff points to Mr. Schumacher as evidence of disparate treatment. However, plaintiff and Mr. Schumacher were not similar or comparable employees. Plaintiff committed five operational errors in his nearly four years as a pumper while Mr. Schumacher committed none in his first four years as a full-time pumper, and further, the errors Mr. Schumacher did commit occurred in 1975, *after* plaintiff was demoted. *Rice v. Gates Rubber Co.,* 521 F.2d 782 (6th Cir. 1975). Furthermore, it appears that Mr. Schumacher's difficulties and hence his disciplinary suspension rather than demotion were the result of attitude problems whereas defendant never complained that plaintiff had attitude problems. In fact, it appears from the record in this case that defendant believed plaintiff to be a hard working employee who was well liked by his fellow employees and supervisors. He was elected a union steward and participated in company sports. Simply put, it appears that the pumper's job was a diffi-

**638**

cult one for plaintiff to perform due to his forgetfulness and inattentiveness. Plaintiff's demotion, rather than disciplinary suspension or discharge, gave plaintiff the opportunity to bid on other, more compatible jobs in the company which he initially declined to do.[7] Moreover, the numerous tank overflows attributed to plaintiff and his failure to satisfactorily perform the pumper job constituted good and sufficient business reasons for defendant's action and established a nondiscriminatory reason for plaintiff's demotion which this court finds was not a pretext. *McDonnell Douglas Corp. v. Green, supra*, 411 U.S., at 804, 93 S.Ct. 1817.

In general, defendant's conduct toward plaintiff cannot be said to have discriminatorily singled plaintiff out for disparately harsh treatment. On the contrary, defendant attempted to assist plaintiff in performing the job as pumper on numerous occasions, and discussed plaintiff's problems with him and his union representatives. This court cannot say that an employer intent on discriminating against an employee would have failed to take some action against an unsatisfactory employee for as long as defendant did here if its actions were in fact racially motivated.

This court is well aware that racial discrimination in employment takes many forms and is often subtle. This court also is fully mindful of

> [t]he broad, overriding interest, shared by employer, employee, and consumer, [in] efficient and trustworthy workmanship assured through fair and racially neutral employment and personnel decisions. In the implementation of such decisions, *it is abundantly clear that Title VII tolerates no racial discrimination, subtle or otherwise.*

*McDonnell Douglas Corp. v. Green, supra*, at 801, 93 S.Ct. at 1823. (Emphasis added). The sincerity of plaintiff's belief that he was discriminated against is not doubted. Nevertheless, this court cannot say, under the facts of this case, that plaintiff has suffered a violation of rights secured to him under Title VII.

The relief which plaintiff here seeks must be denied. Each party will bear its own costs.

Let judgment be entered accordingly.