**Donna M. JACKSON–COLLEY, Plaintiff,**

v.

**DEPARTMENT Of the ARMY CORPS OF ENGINEERS, Lt. General E.R. Heiderg, III, Director, U.S. Army Corps of Engineers, Defendants.**

No. 85–CV–73444–DT.

United States District Court, E.D. Michigan, S.D.

Jan. 7, 1987.

Delores A. Parker, Birmingham, Mich., for plaintiff.

Geneva S. Halliday, Asst. U.S. Atty., Detroit, Mich., for defendants.

### MEMORANDUM OPINION AND ORDER

ZATKOFF, District Judge.

This is a race and sex discrimination case brought pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e–16. The case was tried without a jury before the Court on October 17th, 20th, 21st, 22nd and December 8th, 9th, 10th, 11th, 12th and 15th, 1986.

At the trial, the Court heard the testimony of thirteen witnesses which it has carefully weighed. Plaintiff, Donna Jackson,[1] a black woman, presented the testimony of herself; John O. Hayes, a white man; Phebia Goldsmith, a black woman; Wanda Davis, a black woman; Sherry Glenn, a black woman; and Mary Ferrier, a white woman. Testifying on behalf of the Defendant were Francis O'Neal, a white man; James MacKenzie, a white man; Raymond Beurket, a white man; Roy Moody, a black man; Sharon Gardner, a black woman; Mary Ferrier, a white woman; Joyce Smith, a white woman; and Alan Shapiro, a white man. The Court has also carefully examined and considered the approximately 90 exhibits submitted by the parties.

During the hearing, the Court had the opportunity to and did take into account, each witnesses' ability and opportunity to observe the events to which they testified; his and/or her memory and manner while testifying; any interest, bias or prejudice the witness may have had, and the reasonableness of the witnesses' testimony considered in light of all the evidence in the case. The Court took into consideration all of the foregoing in determining the credibility of all witnesses and the weight to be given to their individual testimony. In accordance with Rule 52 of the Federal Rules of Civil Procedure, the Court hereby sets forth its essential findings of fact and conclusions of law thereon.

By way of her Complaint, Plaintiff, a former civil service employee in the personnel department of the United States Department of the Army Corps of Engineers, Detroit District, contends that she was removed from civil service on account of her race and sex. Specifically, Plaintiff claims that her continued employment with the Army was conditioned on her receptiveness to the sexual advances of her immediate supervisor, James MacKenzie, and, when such advances were rebuffed, that MacKenzie embarked upon a deliberate pattern of retaliation to remove her from civil service and caused her to be treated differently than white coworkers. Defendant, on the other hand, maintains that Plaintiff's claims are entirely fabricated and that her removal from civil service was due solely to her gross and deliberate insubordination and dereliction of duty. In order to adequately understand and address the relevant issues in contest, a brief history of Plaintiff's employment is appropriate.

In December, 1975, Plaintiff, Donna M. Jackson became employed with the Defendant as an intern. In August, 1977, she was promoted to the position of Personnel Management Specialist in which she held a GS–9 rating. Her responsibilities included

---

1. During the trial, Plaintiff was addressed by several names, including Donna Colley, Donna Cooley, Donna Jackson, and Donna Jackson-Colley. The Court will refer to Plaintiff as Donna Jackson for convenience of reference and since this was the name most often used.

coordinating the Community Outreach Program whereby emphasis was placed on recruiting engineers and scientists. During her two-year tenure in this position, she supervised a staff of four people and initiated new progressive directives for recruiting and high visibility for the department. In February, 1979, she was promoted to the Personnel Staffing Specialist Position with a GS–11 rating. In this position she was responsible for Community Outreach, a Special Emphasis Program for recruiting minority engineers and scientists. She also served as EEO Action Officer and Career Counseling Coordinator. She continued to work as Personnel Staffing Specialist until 1980.

In June, 1980, she was promoted to the position of Senior Personnel Staffing Specialist (hereinafter, Chief of Recruitment and Placement), a GS–12 rating, where she was responsible for developing and implementing long-range plans and projects and training for management employees, and employee groups as well as maximizing the use of personnel. In August, 1981, she was appointed Acting Civilian Personnel Officer in the absence of the Personnel Officer. For a four-month period, she assumed the responsibilities for administering the Civilian Personnel Office activities. In January, 1982, when Mr. James MacKenzie became the permanent Civilian Personnel Officer, Plaintiff resumed her position as Chief of the Recruitment and Placement Branch.

As indicated, during all relevant times herein, Plaintiff was serving as the Chief of Recruitment and Placement (GS–12)—one of five branches within the Civilian Personnel Office. Plaintiff's immediate supervisor was James MacKenzie who, as Chief of the Civilian Personnel Office, Detroit District, was responsible for all five branches of The Civilian Personnel Office. MacKenzie's immediate supervisor was Lt. Col. John D. MacMullen, the Deputy District Engineer of the Detroit District. MacMullen in turn reported to Col. Raymond T. Beurket, the District Engineer for the Detroit District, U.S. Army Corps of Engineers. Beurket was the Head of all operations in the Detroit District.

The events pertinent to the instant case occurred in 1982–83. In 1982, the Detroit District of the Corps of Engineers experienced a major Reduction in Force (RIF) whereby many civilian personnel were, in effect, "laid-off" from their jobs. The Recruitment and Placement Branch, of which Plaintiff was Chief, was responsible for the processing and handling of the RIFs. By all apparent indications, the initial RIFs were accomplished successfully and without incident.

A major component of the instant dispute pertains to the processing of appeals to the Merit Systems Protection Board (MSPB) from the initial Reductions in Force (RIF appeals). Altogether, four RIF appeals were filed by adversely affected employees.

The filing by an employee of a RIF appeal with the MSPB triggers a sequential administrative review process whereby the merits of the initial RIF are reviewed. As a part of this sequential process, the agency initiating the RIF—in this case the Detroit District, Army Corps of Engineers—is required to file an answer to the appeal setting forth the agency's position with respect to the validity of the RIF.

The answers to the four RIF appeals previously mentioned were due on October 23rd, 24th and November 16, 1982. No answer having been filed by the Corps of Engineers (the "Agency"), the MSPB, on November 3, 1982 issued a second order directing the agency to respond. Thereafter, following a request for extension of time, the MSPB granted the agency an extension to December 3, 1982, to file its response to all four appeals. Ultimately, all the appeals were filed late; one being so late that it was not considered. The agency was reversed on this latter appeal and severely sanctioned for its nonaction.

The agency held Plaintiff, as Chief of the Recruitment and Placement Branch, ultimately responsible for the failure to timely process the answers to the RIF appeals. Following an independent investigation, Plaintiff was removed from civil service for gross nonfeasance of duty, knowingly mak-

ing false statements to another federal agency, and repeated acts of insubordination. Following an unsuccessful appeal to the MSPB, Plaintiff commenced the instant suit.[2]

By way of her Complaint, Plaintiff, Donna Jackson asserts that the agency's proffered reasons for her firing are pretextual and that she was, in reality, removed from civil service on account of her race and sex. More specifically, Jackson claims that she was subjected to the unwelcome sexual advances of her supervisor James MacKenzie and further subjected to a sexually offensive work environment. Upon her rejection of his alleged advances, Jackson claims that MacKenzie embarked upon a "vendetta" to remove her from civil service. Jackson claims that MacKenzie erroneously charged her with the responsibility of preparing the agency answers to the RIF appeals when, in fact, such answers were his responsibility. Jackson further charges that she was treated differently than similarly situated white employees with regard to various conditions of her employment as well as the severity of the adverse employment action taken against her. With regard to these allegations by Plaintiff, the Court will address the sexual harassment claim first and the race discrimination claim thereafter.

■ In the first instance, it is clear that a claim of hostile environment sexual harassment is a form of sex discrimination actionable under the Title VII employment discrimination statute. *Meritor Savings Bank, FSB v. Vinson,* — U.S. ——, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986). In order to prevail on such a claim, more than mere "harassment," sexual or otherwise, is necessary. To be actionable under Title VII, the complained-of harassment must be sufficiently pervasive or severe so as to affect a term, condition or privilege of employ-

ment within the meaning of the statute. *Vinson,* 106 S.Ct. at 2406. Furthermore, the harassment must also be unwelcome in the sense that the employee deliberately and clearly makes her nonreceptiveness known to the alleged offender. *Id.* at 2406–07.

■ The Sixth Circuit has recently set forth a legal test consistent with *Vinson.* To prevail in a Title VII offensive work environment sexual harassment action, the employee must assert and prove that: (1) that she was subjected to unwelcomed sexual harassment in the form of sexual advances, requests for sexual favors, or other verbal or physical conduct of a sexual nature; (2) that the harassment complained of was based upon sex; (3) that the charged sexual harassment had the effect of unreasonably interfering with the Plaintiff's work performance and creating an intimidating, hostile or offensive working environment that seriously affected the psychological well-being of the plaintiff; and (4) that there exists respondeat superior liability, i.e., knowledge or constructive knowledge on the part of the employer. *Rabidue v. Osceola Refining Co.,* 805 F.2d 611 (6th Cir.1986). In this case, despite exhaustive trial on this issue, the Court finds no persuasive evidence in support of Plaintiff's work environment sexual harassment claim.

■ Plaintiff, Donna Jackson's claim of work environment sexual harassment is comprised of essentially five components. All five components are either directed at or related to her supervisor James MacKenzie in one way or another. Basically, Jackson claims that MacKenzie made a series of outright sexual propositions to her, engaged in a lewd practice of fondling his genitals in her presence, brought her gifts to gain her favor, used vulgar language and innuendo in her presence and engaged

---

2. Plaintiff's appeal to the MSPB challenged only the factual basis for her removal from civil service and raised no charges of sex or race discrimination. Thereafter declining to pursue an appeal as of right to the United States Court of Appeals for the Federal Circuit, Plaintiff commenced a collateral E.E.O. proceeding raising, for the first time, the instant issues of sex and race discrimination. Following a final Department of the Army Decision finding no equal employment opportunity violations, Plaintiff commenced the instant suit on August 1, 1985. As such, all jurisdictional prerequisites are fulfilled and this case is otherwise properly before the Court.

in a public display of sexual behavior by crawling under a table where she was seated. As previously indicated, the Court finds these allegations grossly aggrandized, contrived and otherwise entirely without merit.

Regarding sexual propositions allegedly made by MacKenzie, Jackson cites one "major" incident in February of 1982.[3] At this time, MacKenzie allegedly "gawked" at Plaintiff and suggested that he needed a minority girlfriend to share his money with. However, notwithstanding Jackson's claim that MacKenzie told her he wanted a minority girlfriend at this time, the overwhelming testimony of record indicates that this event never occurred. Plaintiff's own witnesses, Phebia Goldsmith, Wanda Davis and Sherry Glenn all testified that they had never observed MacKenzie make any sexual advances toward Jackson at any time. The testimony of defense witnesses Mary Ferrier, Frank O'Neil, Sharon Gardner and Joyce Smith is in the same vein. Moreover, with respect to MacKenzie's "gawking," the uncontraverted evidence establishes that MacKenzie had a vision disorder whereby one of his eyes "wandered" and could not focus properly. In short, the charges of sexual propositions are so isolated, vague and unsubstantiated that Plaintiff's testimony is simply not credible on this point.

Regarding Plaintiff's Complaint that MacKenzie fondled his genitals in her presence, the Court similarly finds this accusation frivolous, unfounded and mean-spirited. Suffice it to say that the overwhelming uncontradicted testimony of record indicated that MacKenzie had a bad habit of itching himself in the groin area. Although perhaps unbecoming of a gentleman, the testimony disclosed that MacKenzie unconsciously scratched himself in the presence of male and female workers and was in fact embarrassed when this matter was finally brought to his attention.

Moreover and not insignificantly, it is apparent that the discomfort which MacKenzie was experiencing was due to a medical problem. Finally, witnesses who testified on this matter, including Mary Ferrier and Sharon Gardner, testified that this behavior was not sexually offensive.

Turning next to Jackson's allegation of gift giving in order to curry sexual favor, the Court likewise finds this claim without merit. The testimony reveals that MacKenzie gave Jackson an extra plastic coffee cup he had to replace her Styrofoam cups; a note pad with encouraging slogans to increase worker productivity; and a souvenir of crude oil as a conversation piece or desk ornament. The testimony further reveals that MacKenzie often distributed various trinkets such as these to other employees, male and female, in the office as well. MacKenzie regularly brought donuts for the office, purchased corsages for the entire office on secretary's day and, on one occasion, offered to give Jackson $25.00 at a time when she was collecting donations for the office Christmas party. Jackson introduced no evidence whatsoever that would indicate in any way that these trivial "gifts" were anything but innocuous or that her employment was conditioned on their acceptance by her.

As far as MacKenzie using vulgar language is concerned, the Court similarly finds no basis for Jackson's sexual harassment charge. The testimony elicited numerous responses indicating that MacKenzie had a habit of swearing and cursing "at the sky." Nevertheless, all witnesses, including Phebia Goldsmith, Sherry Glenn, Mary Ferrier, Frank O'Neil, Sharon Gardner, Joyce Smith and Alan Shapiro testified that MacKenzie swore and cursed in front of all employees, male and female, as well as in his office. Once again, while perhaps inappropriate behavior in the opinion of some, but not all persons, not one witness testified that MacKenzie's cursing was sex-

---

**3.** Plaintiff also mentions, but does not specify a time frame or other details, that MacKenzie asked her to go to the bar for a drink with him. The uncontradicted testimony, however, indicates that MacKenzie often asked fellow employees to join him for a drink. Moreover, Plaintiff has introduced no evidence that would show that the extension of this offer to her was a form of sexual harassment. This charge therefore, cannot be seriously regarded by the Court.

ually related or sexually offensive. It is clear from the trial of this matter that no conceivable sexual harassment is present in this regard and that Jackson's continued employment was not conditioned on her participation in vulgar discussions.

Finally, the incident cited by Jackson whereby MacKenzie crawled under a table where she was seated cannot be seriously considered as sexual harassment. The overwhelming testimony on this issue reveals that MacKenzie held a meeting with his staff in a room that was so crowded that one could not easily maneuver to the exit door. As a prank and in order to avoid walking over others, MacKenzie crawled under the table to the doorway. The members of the staff in the room laughed and treated this incident as a playful event. Needless to say, Jackson's belated claim that this incident was an effort to look up her dress is spurious and without support in the testimony.

It is plain from the above that Jackson's claims of sexual harassment are completely without corroborating and, in the Court's opinion, border on the malicious. Jackson's wild exaggerations on her claims of harassment as well as her general demeanor and evasiveness on the stand lead the Court to discredit most if not all of her unsubstantiated allegations for sexual harassment.[4] As such, it being the finding of the Court that no incidents of physical or verbal conduct of a sexual nature ever occurred in any degree whatsoever, judgment shall be entered in favor of the Government.

■ The Court now turns to Plaintiff's claim of race discrimination. In a Title VII race discrimination case, the plaintiff has the burden of proving, by a preponderance of the evidence that she was terminated because of her race and sex. This burden of proof does not shift. *McDonnell Douglas Corporation v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973); *Texas*

*Department of Community Affairs v. Burdine*, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981).

■ Under the established case law, the Title VII plaintiff must first prove, by a preponderance of the evidence, a prima facie case of discrimination. Then, if the prima facie case is established, the defendant must articulate a legitimate, nondiscriminatory reason for its action. The employer need not prove the absence of discrimination; it is required only to state a legitimate reason for rejecting the plaintiff. *Board of Trustees v. Sweeney*, 439 U.S. 24, 25, 99 S.Ct. 295, 295, 58 L.Ed.2d 216 (1978). If it does so, the plaintiff must then prove, by a preponderance of the evidence, that the articulated reason was pretextual and not the true reason for the termination, either by showing that a discriminatory reason was the more likely motivation, or by showing that the articulated reason is unworthy of belief. *Burdine*, 450 U.S. at 256, 101 S.Ct. at 1095; *Fields v. Bolger*, 723 F.2d 1216, 1219 (6th Cir.1984).

As was pointed out in the recent case of *Brooks v. Ashtabula County Welfare Department*, 717 F.2d 263, 267 (6th Cir.1983), the district court in a Title VII disparate treatment case cannot require the defendant to persuade the court that the legitimate reason articulated by said defendant actually motivated the employment decision at issue. It is the plaintiff's burden to persuade the court that the asserted reason is pretextual." *Fields*, 723 F.2d at 1219. *Gruff v. W.A. Foote Hospital, Inc.*, 741 F.2d 1486, 1494 (6th Cir.1984).

In *McDonnell Douglas*, a hiring case, the court first set forth, the prima facie case, that a Title VII plaintiff must show:

(1) that he or she belongs to a racial minority;

---

4. The Government also notes that Plaintiff, Donna Jackson, never filed a sexual harassment grievance or complaint against MacKenzie during the time when the events allegedly occurred. Indeed, on her direct examination, Jackson testified that, although she complained about MacKenzie's swearing once to someone she cannot

remember, a complaint would have been futile since the managers "could get away with anything they wanted to." This failure to register a complaint or even to air her grievances to others, while by no means conclusive, further weakens the credibility of Plaintiff's testimony.

(2) that he or she applied and was qualified for a job for which the employer was seeking applicants;

(3) that he or she was rejected despite their qualifications; and

(4) that, after their rejection, the position remained open and the employer continued to seek applicants from persons of the plaintiff's qualifications.

411 U.S. at 802, 93 S.Ct. at 1824. "Since this model was formulated in the context of a discriminatory hiring case, it must be applied *mutatis mutandis* to other instances of alleged race discrimination 'with respect to ... terms, conditions, or privileges of employment.'" 42 U.S.C. § 2000e–2(a)(1) (1976). *See Burdine,* 450 U.S. at 253–54 n. 6, 101 S.Ct. at 1093–94 n. 6. *Grubb v. W.A. Foote Memorial Hospital,* 741 F.2d 1486, 1492 (6th Cir.1984).

 To establish a prima facie case in an employment discharge case, plaintiff must prove:

(1) that she belonged to a racial minority;

(2) that she satisfactorily performed her job so as to entitle her to retain the job; and

(3) that she and a similarly placed white person received dissimilar treatment.

*Burroughs v. Marathon Oil Co.,* 446 F.Supp. 633, 637 (E.D.Mich.1978); *Nichelson v. Quaker Oats Co.,* 573 F.Supp. 1209, 1219 (E.D.Tenn.1983).[5]

 The Court should always bear in mind that its duty in a Title VII case is not to determine which applicant was the best qualified for promotion or as in this case, whether it personally would have terminated the employee, but only to ascertain whether race and/or sex was a factor in the decision. "The fact that a court may think that the employer misjudged the qualifications of the applicant does not in itself expose him to liability." *Mason v. Continental Illinois National Bank,* 704 F.2d 361, 366 (7th Cir.1983), quoting *Lieberman v. Gant,* 630 F.3d 60, 67 (2d Cir. 1980). The burden is on plaintiff to show

that the employer intentionally discriminated against her. *Texas Department of Community Affairs v. Burdine,* 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981); *McDonnell Douglas v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973); *Brooks v. Ashtabula County Welfare Department,* 717 F.2d 263 (6th Cir.1983).

 In this case, Jackson's allegations of race discrimination pertain to the late 1982 through 1983 time frame. During this period, and allegedly as a result of her rejection of MacKenzie's sexual advances toward her, Jackson claims that the Detroit District of the Army Corps of Engineers and, particularly, James MacKenzie, discriminated against her on account of her race. Specifically, Jackson alleges that she was held accountable for the nonpreparation of the previously described answers to the RIF appeals when those duties were not her responsibility. Second, Jackson claims that because of her refusal to succumb to MacKenzie's sexual demands, she and other black employees were denied civilian training opportunities. Third, Jackson claims that in May, 1983 after she had taken an approximate two month sick leave, she was required, unlike other white employees, to take a fitness for duty exam before she could return to work notwithstanding a prior favorable exam from her doctor. Fourth, Jackson claims that despite her readiness to return to work, she was placed on leave without pay status. Fifth, Jackson claims that her supervisory duties were taken away from her and she was disciplined unlike similarly situated white employees with respect to the RIF appeal incident.

After carefully considering the above five basic areas of alleged race discrimination, the Court finds that Jackson has failed to present a prima facie case under Title VII. Although she clearly qualifies as a racial minority, the Court finds that Jackson had not performed her job in accordance with its requirements and, fur-

---

**5.** In *Burroughs, supra* at 637, Judge Keith found that even though plaintiff had been in the position for a number of years, he was not satisfactorily performing his job and thus he was not qualified for retention in the job. Consequently, Judge Keith found that plaintiff had failed to establish a prima facie case of discrimination.

ther, that she was not treated differently than similarly situated white employees. Since these two elements of proof are crucial and dispositive, the Court finds no basis for Jackson's claim of race discrimination.

Addressing the scenario surrounding the answers to RIF appeals first, the Court finds no support for Plaintiff's contention that she was not responsible for the processing thereof. Indeed, the vast testimony of various witnesses on this issue indicates to the contrary. Jackson testified on her direct examination that RIF appeals, in general, were not assigned to the Recruitment and Placement Branch (of which she was Chief) and that, instead the Personnel Officer (in this case, James MacKenzie) usually handled such appeals himself. Jackson further testified that, in this case, she was asked by MacKenzie to do only background work on the four subject appeals and did, in fact, complete such background work as requested. Jackson also testified that MacKenzie never assigned her personally to the task of completing the RIF appeals and only told her to have a lower level action officer, Joyce Smith, prepare them. As mentioned above, though, there is no support for Jackson's naked assertions on this issue.

Jackson's only witness who testified on this issue, Phebia Goldsmith, indicated that she did not know whether or not Plaintiff was responsible for the answers to the appeals. In contrast, the testimony of at least six other witnesses conclusively established that the sole and ultimate responsibility for the preparation of RIF appeals lay with the Chief of Recruitment and Placement, i.e. Jackson. Jackson's coworker Frank O'Neil testified that he had personally observed several exchanges between Jackson and MacKenzie leaving him with a definite conviction that she was responsible. Mary Ferrier, an employee relations specialist employed by the Corps of Engineers for over 21 years, and Sharon Gardner, Chief of Classification, testified that the preparation of RIF appeals had always been the responsibility of the Chief of Recruitment and Placement Branch and had been regularly performed by Jackson's predecessor, Doris Hurd. Additionally, Ferrier and Col. Beurket, the District Engineer and head of the entire Detroit District, testified as to Department of the Army regulations which explicitly vest the Recruitment and Placement Branch with RIF matters. Beurket testified that although Jackson was free to delegate work to her subordinates, she, as Chief, was ultimately responsible. Mary Ferrier and Sharon Gardner also testified that incoming appeals would go directly to the Chief of the Branch and never to the Personnel Officer. Further, Joyce Smith, who worked with Jackson on the four subject RIF appeals and was considered a RIF "expert" around the office testified that the Recruitment and Placement Branch was responsible for RIF appeals and that Jackson, as Chief thereof, was ultimately responsible for their completion. In addition, Alan Shapiro, the District Counsel for the Detroit District of the Army Corps of Engineers, testified that Jackson personally told him in March of 1983 that she, as Chief of Recruitment and Placement, had the sole and only responsibility for the processing of RIF appeals and that no other office was involved. Lastly, Plaintiff's own Performance Standards [6] indicate that responsibility for such RIF matters lay within her realm of responsibility.

In connection with the above testimony, the Court finds the testimony of witnesses Ferrier, Gardner, Smith, Shapiro, Beurket and MacKenzie highly credible on this point. These witnesses demonstrated personal knowledge of the mechanics of RIF appeal processing, knowledge of the past handling of these matters, and regulations pertaining thereto. In contrast, Jackson's

---

**6.** Plaintiff argued vigorously that this particular document is only a performance standard "worksheet" and is not binding. Nevertheless, the Court finds that she was, in fact, working under these performance standards and that they were fully valid and functional. Even as-suming, however, that this was only a performance standard "worksheet," the Court still finds that Plaintiff's duties were clearly established by the ordinary course of performance of the Corps of Engineers as evidenced by witness testimony.

assertion that MacKenzie agreed to handle the RIF appeals is incredible, vague and not accompanied by any meaningful corroborating evidence.[7] Indeed, during her direct examination as well as during her rebuttal case, Plaintiff indicated that she never would have discussed the processing of the subject RIF appeals with Mary Ferrier, *because she already knew how to process them from prior experience.* In short, Jackson's assertion that she was not responsible for RIF appeals is simply not believable.

Having thus found that Jackson was responsible for the RIF appeals, the Court further finds that she failed to see that the four appeals were completed and, thus, neglected this aspect of her job. Three of the four appeals were completed late by Joyce Smith only after repeated calls to Jackson from the MSPB appeals board, and one appeal was never completed by Jackson or her staff at all. This final appeal, the Castilla appeal, was abandoned by Jackson when she went on sick leave despite explicit orders directing her to process it and eventually had to be completed by James MacKenzie in her stead. Nevertheless, the extreme tardiness of the Corps of Engineers caused the MSPB to ignore the agency response and to sanction the agency severely as a result. It, therefore, being the clear finding of the Court that Jackson failed to process the RIF appeals that were her responsibility, there is no basis for her asserting that the charging of her with this responsibility was due to racially discriminatory reasons.[8]

Turning to Jackson's second race discrimination claim, the Court finds no support for her assertion that she as well as other black employees were denied civilian job training opportunities. Again, the overwhelming and unequivocal testimony indicates directly to the contrary. Jackson introduced the testimony of Phebia Goldsmith who testified that black employees did not receive adequate training and that she and others did not submit training requests "because it would be useless to do so." Yet, the hard facts belie this statement. Roy Moody, an EEO investigator, testified that he conducted a thorough study of the Detroit District in response to a complaint by Phebia Goldsmith. Moody's report indicates that black employees received as much and, in many instances, more hours of training than white employees. Ironically, the employee with the most amount of training hours was the complainant, Goldsmith.[9] Further, the various documents and exhibits introduced indicate that Plaintiff, Jackson, received substantial training opportunities. Significantly, Jackson introduced no evidence rebutting the report of the EEO officer aside from her bare assertions. The Court, therefore, finds no evidence of race discrimination with regard to training because blacks were treated as well if not better than whites in this regard.

Moving on to the third issue regarding race discrimination, Jackson claims that following her sick leave, she, unlike white employees returning from the same, was required to submit to a fitness for duty examination notwithstanding her physician's opinion that she was capable of returning to work. Again, on this issue, there is no evidence that Jackson was treated any differently than white employees. Although Jackson, Phebia Goldsmith and John Hayes, a civilian personnel officer, all

---

**7.** The Court finds it obvious from the witness testimony that several exhibits purporting to be phone messages to MacKenzie from Plaintiff evidencing MacKenzie's responsibility for RIF appeals are after-the-fact fabrications assembled by Plaintiff herself.

**8.** Similarly, since the Court earlier concluded that no incidents of sexual harassment had ever occurred, it follows that the placing of blame for the RIF appeal fiasco on Plaintiff was in no way a retaliatory action by MacKenzie for refusal of sexual advances.

**9.** Plaintiff attempts to lessen the substantial impact of the EEO study by arguing that it did not take into account "rotational assignments." However, Plaintiff does not contend that such assignments were a subject of the Goldsmith grievance and introduced no evidence establishing that such rotations were a form of training. Accordingly, the overwhelming impact of the Moody study is not reduced in any degree whatsoever.

testified that they had never heard of a fitness for duty examination, the testimony of Wanda Davis, Mary Ferrier, and Col. Raymond Beurket demonstrated personal knowledge that the fitness for duty exam had been utilized before. In this vein, Mary Ferrier had personal knowledge of a fitness for duty exam being ordered on at least three previous instances, to black as well as white employees. The Court finds the testimony of Davis, Ferrier and Beurket consistent and persuasive. Also, the first-hand personal knowledge of other fitness exams by Ferrier is far more convincing than Jackson's gut feeling that she was somehow "singled out" for a fitness exam following her lengthy illness. Since, therefore, Plaintiff has failed to demonstrate that she was treated any differently than white employees, the Court finds that Plaintiff has failed to establish a prima facie case of race discrimination once again on this issue.

Moreover, even assuming, arguendo, the establishment of a prima facie case of discrimination (the testimony indicated that James MacKenzie had never *personally* ordered a fitness for duty exam for any employee besides Jackson), the Court nevertheless finds that a legitimate business purpose for the exam was articulated by Defendants and was unrebutted. First of all, it is clear from the testimony of Jackson herself as well as Phebia Goldsmith and Sherry Glenn that Donna Jackson was on the verge of a nervous breakdown at the time she went on sick leave.[10] Upon her return to work, Jackson presented a very short doctor's note indicating only that she was physically capable of returning to work as long as she did not lift more than ten pounds at a time. Around this same time, however, MacKenzie and Ferrier were discussing possible adverse action against Jackson because of her responsibility for the RIF appeal fiasco. Since MacKenzie and Ferrier were concerned about the mitigating effect that Jackson's mental

health might have on her job problems, it was deemed necessary to secure a physician's opinion on her mental state. In addition, since the doctor's note submitted by Jackson did not address mental health (and to the contrary—seemed related to physical labor), it was necessary to get a supplemental physician's report *by a doctor of Jackson's own choosing*. All correspondence and requirements for the fitness for duty exam were prepared, not by James MacKenzie, but rather by Mary Ferrier, with the knowledge of Col. Beurket.

The requirement of a fitness for duty exam, then, clearly had a legitimate business purpose. Indeed, the exam requirement was in Jackson's personal best interest since it gave her an opportunity to come forward with clinically documented evidence of illness that would lessen the severity of her impending adverse disciplinary action. Most crucially, though, is that Jackson has failed to come forward with any evidence indicating that the agency's articulated business purpose is a mere pretext for unlawful discrimination. Her bald assertion that this was a part of a MacKenzie "vendetta" against her pales in comparison that agency employees besides MacKenzie, including Ferrier and Beurket, either participated in or condoned the fitness for duty exam requirement. There being no showing of pretext, then, Jackson's race discrimination charge in the context of the fitness for duty exam must fall.

Jackson's fourth charge that she was discriminated against by being put on leave without pay status is no more persuasive than her other charges. The evidence establishes that she was placed on leave without pay status pending the taking of the fitness for duty exam. The fact that Jackson purposefully resisted taking the exam and refused to advise the agency whether she had done so is the sole cause for the approximate six-month period she was on leave without pay. Moreover, leave *with* pay is purely discretionary and Jackson's

---

**10.** Since the Court earlier concluded that no sexual harassment of Plaintiff ever occurred, the Court further concludes that her nervous breakdown and illness are unrelated to any actions on the part of James MacKenzie. Rather, the evidence indicates that Jackson's health problems were more likely caused by personal marital difficulties as well as a general inability to cope with the demands of her employment.

erratic attendance record establishes, according to the testimony of Mary Ferrier, that Jackson would be unlikely to make up the time if leave with pay was granted. Lastly, it is clear that Jackson was kept on leave without pay for a short period of time after finally submitting a fitness exam report in order that her impending removal could be processed. In short, although the testimony did not reveal whether or not any white employees were ever placed on leave without pay, the Court finds that, even if they had not, ample business justification for such action has been demonstrated in this case and remains totally unrebutted by Plaintiff.

Jackson's final assignment of race discrimination is that her job duties were watered down upon her return to work and that she was subsequently disciplined more harshly for the RIF appeals than were white employees for similar offenses. Regarding the former, it is clear that Jackson served as a special assistant to James MacKenzie upon her return rather than as Chief of Recruitment and Placement (although she still remained at a GS–12 level). Nevertheless, it is plain that her neglect in connection with the RIF appeals and insubordination in connection with the fitness for duty exam gave the agency serious reason to doubt her ability to serve in any significant position of authority. Furthermore, the fact that Jackson no longer served as Chief of the Recruitment and Placement Branch serves as ample justification for her exclusion from various branch chief meetings. There is absolutely no evidence that Jackson, or any other black employees for that matter, were excluded from meetings on account of race. Therefore, legitimate business reasons for the above having been proferred and not rebutted, it follows that there can be no finding of discrimination here either.

Regarding the adverse employment action taken against her, the Court similarly finds racial animus not to have been a factor. Although Jackson purports to attribute to James MacKenzie the decision to

remove her from civil service, the uncontested evidence reveals that MacKenzie merely initiated an adverse action against her defining the offenses charged. Significantly, the recommendation of a removal from the agency was submitted by Mary Ferrier, and the decision to remove itself was made by Col. Raymond Beurket. Nowhere does Jackson suggest any impropriety on the part of Ferrier or Beurket nor does the Court find any impropriety. To the contrary, the indisputable testimony reveals that Ferrier and Beurket both conducted an exhaustive, detailed and highly professional fact-finding investigation and analysis of the charges. The documentary evidence of record further reveals an impressive flow chart compiled by Beurket setting forth the charges against Jackson, the investigative action taken, and the findings and reasons resulting from the investigation. In contrast, Jackson's charge that Beurket served as a mere "rubber-stamper" for anything that MacKenzie submitted to him is farfetched and totally unsupported.

In the same vein, the agency's decision to remove Jackson from civil service is wholly untainted by race discrimination. The uncontested evidence reveals that Beurket fully considered the twelve so-called "Douglas factors," which provide guidance for an agency disciplinary action. The testimony of Ferrier, Beurket as well as Plaintiff's prior unappealed grievance hearing before the Merit Systems Protection Board also establish conclusively that Jackson's offenses were of a conduct rather than performance nature, thus eliminating the necessity of providing her with an opportunity to correct her "deficiencies." Several white employees which Plaintiff cited as having been disciplined less severely for "comparable" offenses were clearly not similarly situated. In fact, these white employees were totally dissimilar, having been cited for performance rather than conduct offenses and, thus, being given an opportunity to cure their deficiencies.[11] This being

11. Even if a portion of the allegations against Plaintiff may arguably be classified as "performance," (which the Court has held they cannot) it

is still clear that she was properly processed for "conduct." The uncontested testimony of Mary Ferrier conclusively established that "mixed"

so, the Court finds no basis for Jackson's contention that she was disciplined more harshly than her fellow white employees. Although the Court, had it decided Jackson's fate, may or may not have chosen a lesser sanction than firing, such an inquiry is clearly irrelevant.[12] The only issue before this Court is whether or not Jackson's removal was provoked by discriminatory motives. The Court holds that it was not and, accordingly, enters judgment in favor of the Government on Plaintiff's Title VII claims.

 Having thus entered judgment for the Defendant, the Court further feels compelled to address what it considers to have been a frivolous action that consumed a vast amount of judicial time. In this connection, it is the candid opinion of the Court that this case involved no honestly debatable issue. As pointed out earlier, Plaintiff, Donna Jackson, offered no corroborative evidence to substantiate her allegations of sex discrimination. Likewise, Jackson's race discrimination claim falls in light of evidence that she was not performing her job as required and, further, the alleged disparately treated white employees were not even similarly situated. This being the case, the Court feels it to be its duty to impose sanctions of some sort.

This case, it is clear, basically involved an employee who failed in some of her job duties and was dealt the most severe sanction possible, i.e., termination of her employment. There is no question that this is a serious sanction that impacts dramatically on both employer and employee. As a result of a job termination, an individual undoubtedly experiences severe financial losses and personal difficulties. It is for this reason, though, that procedural safeguards such as administrative and judicial review are available to review such decisions for error or impropriety.

It is also clear that Plaintiff, Donna Jackson availed herself of such review procedures in this case. Jackson appealed her dismissal to the Merit Systems Protection Board claiming, in essence, that there was error in the decision-making process and that the sanction imposed upon her was excessive. The Merit Systems Protection Board upheld the agency's decision and further held the sanction imposed to have been appropriate. Not having pursued her appeal as of right on this matter, the issues surrounding the removal procedures taken by the agency are final and not properly before this Court. Yet, this is precisely what Plaintiff has chosen to do under the guise of Title VII.

Throughout the trial of this matter, Plaintiff failed to introduce any corroborating evidence on racial or sexual discrimination despite repeated requests by the Court to do so. Rather, Plaintiff continued to try issues that were related to the *correctness* of the agency's decision to remove her. Having thus ignored the crucial issues of race and sex discrimination, the Plaintiff ignored the very crux of any Title VII claim. In other words, having made the quantum leap from trying the "correctness" to the "propriety" of the agency action, Plaintiff failed to observe the relevant proofs necessary to sustain such a claim. In a Title VII case, "[d]iscriminatory preference for any groups, minority or majority, is precisely and only what Congress has proscribed." *Griggs v. Duke Power Co.*, 401 U.S. 424, 430–31, 91 S.Ct. 849, 853–54, 28 L.Ed.2d 158 (1971).

---

cases of conduct *and* performance were properly processed as conduct-related. Since Plaintiff's counsel admitted to the Court in her response to Defendant's motion for directed verdict that the failure to submit to a fitness for duty exam was related to conduct, it therefore follows that Plaintiff was properly processed for conduct offenses *no matter what the nature of any additional charges brought against her.*

**12.** Thus, the opinion of Plaintiff's witness, John Hayes, that he would have considered Plaintiff's offenses to be performance rather than conduct, related is simply immaterial. The "correctness" of the agency's decision or the severity of the penalty imposed was fully litigated before the Merit Systems Protection Board and acquired full collateral estoppel effect when Plaintiff failed to pursue her appeal as of right to the U.S. Court of Appeals for the Federal Circuit. 5 U.S.C. § 7703. The only relevant issues are those of race and sex discrimination.

In this case, the Plaintiff failed to present any arguable issue of race or sex discrimination. It is apparent to the Court that Plaintiff, Jackson, merely sought to invoke the jurisdictional basis of Title VII in order to retry the issues raised before the MSPB and gain a second shot at the target. Yet, having invoked the protections of Title VII, it was incumbent upon Plaintiff to present a material issue of discrimination. This she failed to do and, having so failed, it is the duty of this Court to address the serious deficiencies which plague this complaint and render it meritless.

Rule 11 of the Federal Rules of Civil Procedure governs the maintenance of frivolous and baseless litigation.

> Every pleading, motion and other paper of a party represented by an attorney shall be signed by at least one attorney of record in his individual name ... The signature of an attorney or party constitutes a certificate by him that he had read the pleading, motion or other paper; that to the best of his knowledge, information, and belief formed after reasonable inquiry it is well grounded in fact and is warranted by existing law or a good faith argument for the extension, modification, or reversal of existing law, and that it is not interposed for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation ... If a pleading, motion or other paper is signed in violation of this rule, the court, upon motion or upon its own initiative, shall impose upon the person who signed it, a represented party, or both, an appropriate sanction, which may include an order to pay to the other party or parties the amount of the reasonable expenses incurred because of the filing of the pleading, motion, or other paper, including a reasonable attorney's fee.

Rule 11 was amended in 1983 to eliminate the requirement that there be a show-ing of subjective bad faith, and the standard now applicable is an objective one. The Rule now requires a reasonable inquiry to ensure that a complaint is well-grounded in fact and arguably supported by law. The Rule was amended "to reduce the reluctance of courts to impose sanctions ... by emphasizing the responsibilities of the attorney and reinforcing those obligations by the imposition of sanctions." Advisory Committee Note, Fed.R.Civ.P. 11. This standard is more stringent than the original good faith standard and the Rule will thus be triggered under a wider range of circumstances. *Id.* The standard is one of reasonableness under the circumstances and, when a violation of the standard occurs, the imposition of sanctions is mandatory. *Albright v. Upjohn Co.*, 788 F.2d 1217 (6th Cir.1986).

While a finding of a violation of Rule 11 requires the imposition of sanctions, the selection of the type of sanction lies within the discretion of the Court. The Rule itself requires that the Court impose an "appropriate" sanction.

Here, Jackson's Complaint was neither well-grounded in fact nor arguably supported by law. It is plain to the Court that any adverse job consequences suffered by Jackson were the product of her own professional and emotional problems and not the product of discrimination. Furthermore, the utter absence of evidence on her discrimination claims lead the Court to conclude without hesitation that this case was filed in bad faith with the intent to harass and badger the Defendants with imaginary claims and theories as a last-ditch effort to get her job back again. In short, the Court finds this case to have been an outrageous waste of judicial time and resources. As a result, it is hereby ordered that Plaintiff Donna Jackson individually pay to Defendants the actual costs and attorney fees involved in the defense of this lawsuit.[13]

---

**13.** The Court finds this sanction more appropriately imposed on Plaintiff rather than her attorney. It is the perception of the Court that not only did Plaintiff continuously give perjured testimony while on the stand, but also that she had lied to her attorney with respect to the true facts herein. At several times during the trial, Plaintiff's attorney appeared surprised and confused by the testimony elicited from the witnesses.

■ Aside from the bad faith factual basis of the Complaint herein, the Court also is obliged to address the manner in which the case was tried. Without question, Plaintiff's counsel needlessly increased the cost of litigation and caused unnecessary delay by insisting on trying the merits of Plaintiff's discharge rather than focusing on the relevant issues of race and sex discrimination. Plaintiff's counsel pursued this tack despite numerous admonitions from the Court and directions to confine her examination to relevant issues. Moreover, the Court was generally burdened throughout this trial by counsel's unintelligible objections, rambling and redundant questions, lack of continuity in presentation, mischaracterization of testimony, and unfamiliarity with elementary evidentiary rules and procedures. The Court cannot and will not subject the taxpayers of this Nation to such needless drain on the Federal budget. Plaintiff's counsel, therefore, is hereby sanctioned in the amount of $500.00 to be paid to the Clerk of the Court within 30 days hereof.

Let this case therefore serve as notice that this Court will not hesitate to impose severe sanctions in cases that are so groundless that they can only waste the resources of the judiciary. At the same time, however, let it be known that this Court will not hesitate to lend its full powers in a similarly decisive fashion in favor of a truly aggrieved individual, be they prisoner or ordinary citizens.

A judgment consistent with the foregoing shall enter accordingly.