Sharon **HARTLEIP**, Plaintiff–Appellant, Cross-Appellee,

v.

**McNEILAB, INC.,** Defendant–Appellee, Cross-Appellant.

Nos. 94–1786, 94-1825.

United States Court of Appeals, Sixth Circuit.

Argued Feb. 2, 1996.

Decided May 13, 1996.

---

Keith Godfrey (argued and briefed), Detroit, MI, for plaintiff-appellant, cross-appellee.

Claudia D. Orr (argued and briefed), Honigman, Miller, Schwartz & Cohn, Detroit, MI, for defendant-appellee, cross-appellant.

Before: NORRIS and MOORE, Circuit Judges; MILES, District Judge.[*]

MILES, District Judge.

Sharon Hartleip appeals the district court's order granting summary judgment in favor of McNeilab, Inc. ("McNeil")[1] in this diversity action asserting claims of sexual harassment in violation of Michigan's Elliott–Larsen Civil Rights Act ("ELCRA"), M.C.L. § 37.2101 *et seq.*, intentional infliction of emotional distress, and breach of contract. McNeil cross-appeals the district court's denial of its request for sanctions under Fed. R.Civ.P. 11. For the reasons to follow, we affirm.

*I*

Sharon Hartleip began working for McNeil as a sales representative in March, 1990. She was assigned to the company's Detroit district, where her responsibilities included selling McNeil's pharmaceutical products to hospitals, doctors, and pharmacies within her assigned territory. In late March, 1992, Hartleip was recruited by and accepted a position with another pharmaceutical company, Glaxo, Inc. On April 4, 1992, Hartleip resigned from McNeil, giving two weeks' notice. After Hartleip had already informed her then-supervisor, district manager Robert Haas, that she was resigning, she told him that one of the reasons why she was leaving the company was because she had been sexually harassed by another McNeil employee, Calvan Barnes.

---

[*] The Honorable Wendell A. Miles, United States District Judge for the Western District of Michigan, sitting by designation.

1. McNeil contends that Hartleip incorrectly identified it in the complaint as Ortho–McNeil Pharmaceutical, Inc. In this appeal we have corrected the caption accordingly.

Hartleip first met Barnes during a three-week formal training session which she attended at the company's headquarters in Springhouse, Pennsylvania in July, 1990. Barnes was one of several sales trainers assisting in training during the Springhouse program. At the time, Barnes was employed by McNeil as a hospital representative in the company's Chicago district. He was not a managerial employee, nor were any of the other sales trainers who assisted in the training program. At the conclusion of the training program, participants such as Hartleip were evaluated by the sales trainers on the basis of their performance at the training sessions. These evaluations were provided to the trainees' district managers as an assessment of strengths and weaknesses, and as guidance for further development of the trainees. They did not affect compensation or promotional opportunities.

Hartleip alleges that during the second week of the Springhouse training, another new sales representative and participant in the program, Todd White, approached her and informed her that the representatives were supposed to visit the trainers in the evening to ask questions and practice presentations. White also allegedly informed Hartleip that Barnes was upset because she had not come to him for this purpose, and that her training evaluation would probably be "marked down" if she did not do so. After this conversation, Hartleip alleges, she went to Barnes' hotel room and asked training-related questions. He provided her with responses, and nothing inappropriate happened either during this visit or at any other time during the Springhouse training.

Hartleip alleges that after the Springhouse training, she began receiving telephone messages from Barnes. Although it is unclear how many messages Barnes left, Hartleip has testified that none of the messages was of an inappropriate or sexual nature; they consisted of such comments as "How are you doing? Please give me a call." Hartleip also testified that she did not return the calls. However, in December, 1990, while traveling to Chicago en route to Iowa to visit her parents for the Christmas holidays, Hartleip called Barnes, hoping to arrange a business lunch. At this time, although Barnes was still merely a hospital representative, Hartleip testified that she thought he would be a "good resource" for her career because he was "like the next level up from me."

Barnes declined to have lunch, but instead suggested that the two meet for dinner. Hartleip agreed. Barnes met Hartleip at her hotel, and they went to a restaurant for dinner. During the dinner, Hartleip alleges, Barnes wanted to discuss her personal life, including the subject of who she was dating. He also commented on Hartleip's appearance, stating "You have lovely long legs. You're a beautiful woman." This apparently made Hartleip uncomfortable, for she testified that she did not know how to respond. However, after dinner, she agreed to accompany Barnes to a blues bar. Hartleip alleges that she did so because Barnes was "above" her and she did not want to offend him. The following day, Hartleip also agreed to go Christmas shopping with Barnes. While shopping, Hartleip testified, Barnes talked about his personal life, including his relationship with another woman. Although Hartleip believed this conversation to be inappropriate, she later allowed Barnes to drive her to the train station. The Chicago visit was the only occasion on which Barnes and Hartleip saw each other apart from business meetings; the two never worked in the same city.

Beginning in January, 1991, Barnes telephoned Hartleip perhaps once or twice per month. During a conversation in January, 1991, Barnes told Hartleip that he "thought about [her] all the time." He apparently attempted to discuss her personal life, and Hartleip had the impression that he was trying to find out if she was romantically interested in him. The two saw each other briefly at a professional meeting in Palm Springs in late January or early February, 1991. After this meeting, Barnes sent Hartleip a postcard on which he wrote,

Welcome Home!!! Even though I didn't see much of you, your being in Palm Springs made a wonderful place a little nicer. All the best with Floxin!

*You are fabulous* !

Barnes also telephoned Hartleip again in February. During this conversation he suggested that they try to see each other outside of work.[2] Hartleip refused.

The next telephone call which Hartleip could remember was in March, 1991. During that call, Barnes again told Hartleip he wanted to come visit her; he offered to fly to Detroit "discreetly" and suggested that this be kept secret from others in the company.[3] Hartleip told Barnes not to visit, and informed him that she was dating someone else. Hartleip testified that during this call Barnes also said derogatory things about her new district manager, Robert Haas.[4] Hartleip testified that Barnes stated, "I don't like Rob. If you ever have any problems with him, call me."

Hartleip could remember few specifics of any phone conversations between April and June, 1991, but recalled only that they talked "pretty regular" once or twice per month.[5] At one point (it is unclear when), while the two were attending the same business meeting in Florida, Barnes left Hartleip a message asking her to meet for a drink; she declined.

Hartleip testified that in either June or "late summer" 1991 Barnes called her after he had been promoted to the position of district manager for McNeil's St. Louis, Missouri district. By that time, Hartleip testified, the nature of Barnes' calls became "worse." He clearly wanted to see her, and began telling her that he was "good friends, if not best friends, with Gerald Bruce." In March, 1991, Bruce had become a regional manager for McNeil in charge of a region which included the Detroit district in which Hartleip worked. Hartleip testified that Barnes stated as follows:

I think you're a great rep. I hear great things about you. I think you deserve a promotion. If you fly down to St. Louis, you will get a promotion if you spend the weekend with me.... I will even pay for the ticket.

Hartleip construed the invitation as laden with sexual innuendo, even though Barnes never explicitly mentioned sex. According to Hartleip, Barnes became angry when she refused his invitation.

Barnes sent Hartleip a total of four cards between February and sometime in the fall of 1991. We have already detailed the contents of the first, a postcard. The remaining three cards read as follows in their entirety, in no particular order:

### Card No. 2

Thanks for the Aspen message to call.

I'm writing this in advance of my call.

Sharon, I feel very awkward. Somehow, I have the sensation that I put you on the spot. That was not my intention. You are an *incredible* lady. Rarely has a woman been so feminine and so warm and unassuming. Regardless of the outcome of the call, please know that you will always have my respect and wishes of success.

You really are a beautiful, warm and impressive lady.

I hope I haven't jeopardized our friendship.

### Card No. 3

I was thinking about you and it occurred to me that outside of Palm Springs, it's been 4+ months since your visit.

You really have me entranced. Every time I spend with you you amaze me. You

---

2. Hartleip testified that Barnes said "This is no way to live. I'd like to see you" and "I think you're a wonderful person."

3. Hartleip initially testified that Barnes said "[d]o not go to a manager and talk to them about this because people don't like fraternization or whistle-blowers, for that matter." She then admitted that he did not use the term "whistleblowers" but merely suggested that she not tell management because "[t]hey don't like fraternization."

4. Haas was promoted to replace Hartleip's previous district manager, John Bradley, who was promoted to a position in Springhouse in March, 1991.

5. Some additional comments which Hartleip testified Barnes made during telephone conversations include "You have long, long legs, beautiful long legs" and "You have a beautiful face. You're a beautiful woman. You have a very attractive figure."

are one of the most gracious and feminine women I know. Each time you thank me for saying something nice, I smile from ear to ear.

Remember, *you* are the wonderful one, I'm just commenting on a lovely lady.

Stay Happy.

### Card No. 4

I have been debating whether or not to give you a call.

There seems to be so many reasons not to pick up the phone. Yet, the voice inside of me says there is one overriding reason to call. 'Because Sharon is wonderful and you want to see her.' I would greatly enjoy seeing you.

You are such a lovely lady.

This card caught my eye and I was grinning from ear to ear. Some days are much like this card.

Be Happy.

Hartleip apparently believed that her career began to be affected by Barnes in June, 1991. She assessed that after she refused his invitation to come to St. Louis, "things started to happen to me at McNeil through Gerald [Bruce]," with whom Barnes had claimed to be "good friends." However, Hartleip identified only three adverse employment decisions in which she alleges Bruce may have played a role.[6] The first was the denial of an award known as the Sales Training Achievement and Recognition ("S.T.A.R.") Award, for which she had been recommended by her supervisor, Robert Haas. The S.T.A.R. Award consisted of a plaque and a $250 gift certificate, and was given to the outstanding achievers in each sales training class. The second adverse decision was the alleged denial of an award of $2,000 worth of company stock for recruiting another individual to work for the company; for simplicity's sake we shall refer to this as the "Stock Award." The third decision consisted of the cancellation of a display at Providence Hospital.

The evidence presented to the district court shows that Hartleip failed to meet the company's objective criteria for the S.T.A.R. Award, which included maintaining an average of three retail calls per day; Hartleip admitted that her average was 2.9. The evidence also showed that Hartleip was informed approximately one month after she left McNeil that she was eligible to receive a Stock Award for recommending the employment of another individual who was hired to work for the company. Finally, the evidence showed that lack of funding was the reason given for the cancellation of the hospital display.

Apart from Barnes' cards, phone calls and/or messages, and the Chicago visit, Barnes did not, during Hartleip's employment with McNeil, personally engage in any other activities which Hartleip found to be of a harassing nature. However, Hartleip did testify that she had been told by Todd White that Barnes had sexual fantasies about her and another female employee. Hartleip also testified that White had warned her to "be careful" because Barnes might "show up on [her] doorstep."[7] Hartleip further testified that she was afraid of Barnes because she was told by another sales representative, Caren Bostick, that Barnes had also harassed Bostick, who feared that Barnes would attempt to "blackmail" her by threatening to divulge information to the company about a romantic liaison Bostick had allegedly had with a married man whom she met on a business trip.[8] Hartleip's complaint expressly states that Barnes' alleged harassment ceased "when the Anita Hill/Clarence Thomas hearings began" in 1991. Complaint

---

**6.** Hartleip's testimony is somewhat vague regarding when these events took place. Viewing the facts in her favor, we assume they took place after she rejected Barnes' invitation.

**7.** Hartleip testified that at one point she deemed White to be "a very good friend of mine," but later she assessed that White had played a role in the harassment by conveying information of a personal nature to Barnes. White denies that he ever warned Hartleip about Barnes, and he also denies having told Hartleip that her training evaluation would be marked down if she did not pay Barnes a visit during training.

**8.** Bostick denies that Barnes ever harassed her or attempted to blackmail her.

& Jury Demand, ¶ 17.[9]

The undisputed evidence shows that shortly after she began working for McNeil, Hartleip's then-district manager, John Bradley, discussed with her the company's written policy against harassment. Initially, the policy indicated that harassment should be resolved through the company's written "Problem Resolution Procedure," which required, at its first step, that the problem be reported to the employee's supervisor. Subsequently, in February, 1991, McNeil published another policy on harassment, which encouraged employees to report the conduct to their immediate supervisor, or, where the supervisor was involved, to report it to Jim Kuhn, Director of Employee Relations, without fear of retaliation. Although Hartleip admittedly had friendly relationships with both Haas and Bradley, she did not inform Bradley of the alleged harassment, nor did she notify Haas of it until after she had given her resignation during the first week of April, 1992.

On April 13, 1993, Hartleip filed a four-count complaint against McNeil in Oakland County Circuit Court which included claims of both quid pro quo and hostile environment sexual harassment under the ELCRA, as well as claims of intentional infliction of emotional distress and breach of contract. McNeil filed a timely notice of removal to the district court and ultimately moved for summary judgment on all claims. McNeil also sought sanctions under Fed.R.Civ.P. 11. After hearing oral argument on the motions, the district court issued a one-page order granting McNeil's motion for summary judgment, but denying Rule 11 sanctions. Hartleip filed a timely notice of appeal, and McNeil filed a timely cross-appeal of the denial of sanctions.

## II

Hartleip argues that the district court erred in granting summary judgment to McNeil on her claims of sexual harassment.

We review a district court's grant of summary judgment under a *de novo* standard of review. *E.E.O.C. v. University of Detroit*, 904 F.2d 331, 334 (6th Cir.1990). We examine the grant of summary judgment to determine 'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.' *Booker v. Brown & Williamson Tobacco Co.*, 879 F.2d 1304, 1310 (6th Cir.1989) (citation omitted). Although we must draw all justifiable inferences in favor of the non-moving party, *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986), there must be a disagreement regarding an item of *material* fact. *Kochins v. Linden–Alimak, Inc.*, 799 F.2d 1128, 1133 (6th Cir.1986). The evidence presented must be sufficient to permit the plaintiff to recover if accepted by the jury.

*Faughender v. City of North Olmsted, Ohio*, 927 F.2d 909, 911–12 (6th Cir.1991).

Hartleip's claims of sexual harassment are based upon the ELCRA. M.C.L. § 37.2101 *et seq.* Section 103 of that statute, M.C.L. § 37.2103, defines sex discrimination in the following terms:

(i) Discrimination because of sex includes sexual harassment which means unwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct or communication of a sexual nature when:

(*i*) Submission to such conduct or communication is made a term or condition either explicitly or implicitly to obtain employment, public accommodations or public services, education, or housing.

(*ii*) Submission to or rejection of such conduct or communication by an individual is used as a factor in decisions affecting such individual's employment, public accommodations or public services, education, or housing.

(*iii*) Such conduct or communication has the purpose or effect of substantially

9. These hearings took place in October, 1991. *See* 137 Cong. Rec. S14622–01 (daily ed. Oct. 15, 1991). Hartleip testified that Barnes called her

again after he found out she was leaving the company, but apparently she does not allege that call to be of a harassing nature.

interfering with an individual's employment, public accommodations or public services, education, housing, or creating an intimidating, hostile, or offensive employment, public accommodations, public services, educational, or housing environment. Because the language of the ELCRA "strongly parallels" the language of the Equal Employment Opportunity Commission's guidelines adopted for enforcement of Title VII of the Civil Rights Act of 1964, Michigan courts have generally looked to federal precedent for guidance in interpreting the ELCRA. *E.g., Radtke v. Everett,* 442 Mich. 368, 501 N.W.2d 155, 162 (1993). However, unlike its federal counterpart, the ELCRA contains provisions specifically designed to outlaw two forms of sexual harassment: hostile work environment sexual harassment and quid pro quo sexual harassment. *Champion v. Nationwide Security, Inc.,* 450 Mich. 702, 545 N.W.2d 596, 599(1996). Hartleip's complaint alleges both forms of sexual harassment.

 A plaintiff pursuing a claim of quid pro quo harassment under the second subsection of section 103 of the ELCRA, M.C.L. § 37.2103(i)(ii), on which Hartleip relies here, must establish two things: "(1) that she was subject to any of the types of unwelcome sexual conduct or communication described in the statute, and (2) that her employer or the employer's agent used her submission to or rejection of the proscribed conduct as a factor in a decision affecting her employment." *Champion,* 545 N.W.2d at 599. Although we conclude that Hartleip has raised a factual issue with respect to the first of these requirements, we conclude that she has failed to raise a genuine issue with respect to the second requirement. In other words, she has failed to show that McNeil or any of its agents used Hartleip's submission to or rejection of Barnes' advances as a factor in a decision affecting her employment.

 "[Q]uid pro quo harassment occurs only where an individual is in a position to offer tangible job benefits in exchange for sexual favors or, alternatively, threaten job injury for a failure to submit." *Id.,* 545 N.W.2d at 601. Therefore, "the party engaged in quid pro quo harassment is almost always, by definition, a supervisor." *Id.,* 545 N.W.2d at 601. Hartleip, who never submitted to Barnes' advances, must tie an adverse employment decision to her rejection of his advances. In this regard, Hartleip's claim of quid pro quo harassment is fundamentally deficient. Because Hartleip concedes that Barnes never had supervisory authority over her, she cannot argue that he was directly responsible for any employment decisions affecting her. However, she argues that because Barnes told her he was "close friends" with Gerald Bruce, who did have an impact on these decisions, an inference can be made that Barnes influenced Bruce and presumably that Barnes was therefore somehow responsible for the decisions.

 The only adverse employment decisions about which Hartleip has complained are her failure to receive the S.T.A.R. Award, her alleged failure to receive the Stock Award, and the cancellation of the Providence Hospital display. The facts presented to the district court showed that Robert Haas, who recommended Hartleip for the S.T.A.R. Award, admitted that she did not meet the objective criteria for the award. This fact was also confirmed by Haas' predecessor, John Bradley. Although Hartleip was one-tenth of one point short of the average number of daily retail calls (three) required in order to receive the award, Haas testified that he recommended Hartleip for the award because he thought Bruce would approve it, inasmuch as the $250 amount did not represent a tremendous financial outlay for the company. As for the Stock Award, the evidence presented to the district court indicates that the award was not denied to Hartleip; Hartleip demanded the award in giving her two-week notice, and the award was approved shortly after she left the company. Moreover, as for the cancellation of the display at Providence Hospital, Hartleip merely testified that the display was cancelled by the hospital because a donation promised by the company had not been made. Hartleip testified that when she called Bruce's office to find out what happened to the donation, she was told by Bruce's secretary that "Gerald said there is no money. Tough luck." Hartleip has not

shown that there was indeed funding for the donation, nor has she presented other evidence tying the cancellation to her response to Barnes' advances. Because Hartleip presented no evidence tying these adverse employment decisions to Barnes' alleged influence over Gerald Bruce, we conclude that Hartleip simply did not present evidence raising a genuine issue of fact regarding whether her rejection of Barnes' advances was used as a factor in decisions affecting her employment.[10]

Hartleip also asserted a claim of sexual harassment based on a hostile working environment. In *Radtke,* the Michigan Supreme Court outlined the following five elements required to establish a prima facie case of a hostile work environment: (1) the employee belongs to a protected group; (2) the employee was subjected to communication or conduct on the basis of sex; (3) the conduct or communication was unwelcome; (4) the unwelcome conduct or communication was intended to or in fact did substantially interfere with the employee's employment or created an intimidating, hostile, or offensive work environment; and (5) respondeat superior. 501 N.W.2d at 162.

▪▪▪ Hartleip argues that these five elements are unequivocally satisfied in this case. The district court concluded that Hartleip's proofs were deficient on the fifth element of the claim—respondeat superior—in part because McNeil's management had no notice of Barnes' alleged conduct. In hostile environment cases, "[a]n employer, of course,

must have notice of alleged harassment before being held liable for not implementing action." *Radtke,* 501 N.W.2d at 169 (citations omitted). We agree with the district court that Hartleip failed to show that McNeil had timely notice of the alleged harassment.

▪▪▪ Hartleip suggests that the burden is on McNeil to prove that "it definitely was not aware of the sexual harassment." Brief for Appellant at p. 20. However, the law is clear that in a hostile work environment situation, the burden of establishing respondeat superior is included as an element of the employee's prima facie case. *Radtke,* 501 N.W.2d at 162. In this case, the undisputed evidence shows that Hartleip did not notify her supervisor of Barnes' alleged harassment until after she had already resigned from McNeil. Hartleip's failure to avail herself of the company policy for reporting the harassment weighs strongly against imposing liability on McNeil. *Cf. Meritor Savings Bank v. Vinson,* 477 U.S. 57, 72–72, 106 S.Ct. 2399, 2408–08, 91 L.Ed.2d 49 (1986) (plaintiff's failure to invoke grievance procedure and policy against discrimination not dispositive, where grievance procedure required employee to complain first to supervisor, who was the harasser).

▪▪▪ Hartleip further argues that because she ultimately provided notice and because McNeil took no action against Barnes, the respondeat superior element of her claim is established. However, the purpose of providing notice to the employer is to enable the

---

**10.** We note that in the concluding paragraphs of both of her briefs on appeal, Hartleip argues that she was constructively discharged. *See* Brief for Appellant at p. 27 ("Appellant was a victim of constructive discharge due to the offensive remarks and abhorrent behavior displayed by Calvan Barnes"); *see also* Appellant's Third Brief at p. 24. "[A] constructive discharge occurs only where an employer or its agent's conduct is so severe that a reasonable person in the employee's place would feel compelled to resign." *Champion,* 450 Mich. 702, 545 N.W.2d 596, 600 (citations omitted). The decision to terminate in a constructive discharge case is imputed to the employer. *Id.*

Hartleip's argument that she was constructively discharged ignores her own admission that Barnes ceased his alleged harassing conduct at the time of the Anita Hill/Clarence Thomas hear-

ings in October, 1991, months before Hartleip resigned, having accepted a position with another company. We also note that elsewhere in her brief, Hartleip concedes that she resigned from McNeil because she believed she would not advance in the company. *See* Brief for Appellant at p. 8 ("Due to [appellant's] feeling that she would remain a sales representative at [McNeil], as a result of the conspiracy against her by Gerald Bruce and Calvan Barnes, she left her position at Defendant in 1992 and secured employment at [Glaxo]"); *see also* Appellant's Third Brief at p. 8. Hartleip has not shown that she ever sought, was recommended for, or was denied a promotion. Under the circumstances, we conclude that she has failed, as a matter of law, to raise a genuine factual issue regarding whether she was constructively discharged.

employer to investigate and take prompt and appropriate remedial action. *Radtke*, 501 N.W.2d at 168. Because Hartleip did not tell Haas about the harassment until months after the conduct had already ceased—and after she had already resigned—she did not provide McNeil with the opportunity to take remedial action.

■ Finally, Hartleip argues that she told other employees—though not her supervisors—about the harassment. She apparently believes that this was sufficient to place the company on constructive notice and to require it to take remedial action. However, Hartleip's deposition testimony merely indicates that she told "some people"—presumably unidentified co-workers—about the harassment, and the testimony does not even indicate when she did so. Moreover, the law requires that the complaint be made to " 'higher management' " unless the harassment is so pervasive that constructive knowledge may be inferred. *McCarthy v. State Farm Ins. Co.*, 170 Mich.App. 451, 428 N.W.2d 692, 695 (1988) (citation omitted). Under the circumstances, we conclude that Hartleip failed as a matter of law to provide notice to McNeil in a manner sufficient to satisfy the respondeat superior element of her claim.[11]

### III

■ Hartleip's claim for intentional infliction of emotional distress is based on the same factual scenario as the sexual harassment claims. Four elements are generally considered to be essential to a prima facie claim for intentional infliction of emotional distress: (1) extreme and outrageous conduct; (2) intent or recklessness; (3) causation; and (4) severe emotional distress. *Roberts v. Auto–Owners Ins. Co.*, 422 Mich. 594, 602, 374 N.W.2d 905, 908 (1985). Liability may be found " 'only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as

atrocious, and utterly intolerable in a civilized community.' " *Id.* (quoting Restatement Torts, 2d, § 46, comment d, pp. 72–73).

■ Hartleip argues that Barnes' verbal remarks and actions were sufficiently outrageous to raise a jury question on this claim. She contends that she satisfied the strict standard for establishing the tort by presenting evidence that Barnes "threaten[ed][her] employment stability"; that he "appl[ied] pressure on [her] on a weekly basis to engage in conduct that she [had] no interest in pursuing"; that he "constantly" called and wrote to her; and that he "discuss[ed] sexual fantasies with other employees about [her]." Brief for Appellant at p. 24. Hartleip also argues that Barnes' actions caused her "psychological grief" and triggered unspecified "physical maladies." *Id.* However, we conclude, as did the district court, that Barnes' conduct was not sufficiently outrageous as a matter of law. *See Trudeau v. Fisher Body Division, General Motors Corp.*, 168 Mich. App. 14, 423 N.W.2d 592 (1988) (sexually vulgar proposition by supervisor, followed by discharge from employment, not sufficiently outrageous to state a cognizable claim for intentional infliction of emotional distress); *Joumas v. Maryland Casualty Co.*, 698 F.Supp. 675, 679 (E.D.Mich.1988) (wrongful discharge/ELCRA discrimination case in which conduct alleged did not satisfy "particularly strict standard" for the tort of intentional infliction of emotional infliction of emotional distress). Accordingly, we conclude that the district court did not err in granting McNeil's motion for summary judgment on this tort claim.

### IV

■ Hartleip's claim for breach of employment contract is based on an unspecified contract which she alleges included an implied provision that she would not be sexually harassed in violation of the ELCRA.

11. Because we find two issues—the failure to tie any adverse employment decisions to Barnes' conduct, and the failure to establish respondeat superior liability—to be dispositive of Hartleip's respective quid pro quo and hostile environment sexual harassment claims, we do not address the remaining issues and defenses raised by McNeil, including its argument that the ELCRA violates the First Amendment.

The district court concluded that this claim was preempted by the ELCRA. We agree.

Michigan law provides that

When a statute creates a new right or imposes a new duty having no counterpart in the common law, the remedies provided in the statute for violation are exclusive and not cumulative. Correlatively, a statutory remedy for enforcement of a common-law right is deemed only cumulative.

*Covell v. Spengler,* 141 Mich.App. 76, 366 N.W.2d 76, 79 (citing *Pompey v. General Motors Corp.,* 385 Mich. 537, 552, 189 N.W.2d 243 (1971)), *appeal denied,* 422 Mich. 977, 374 N.W.2d 420 (1985). Michigan did not provide a common law remedy for discrimination in employment. *Pompey,* 189 N.W.2d at 251 (race discrimination). Therefore, because the remedy sought by Hartleip did not exist at common law, and indeed because her contract claim as framed by her complaint is premised on duties recognized in the EL-CRA, her exclusive remedy lies in an action under the ELCRA. *See White v. Electronic Data Systems, Corp.,* No. 91–2379, 1992 WL 209355, at **3–4 (6th Cir. Aug. 28, 1992) (concluding that the separate common law remedy for discrimination recognized in *Pompey* did not survive the enactment of the ELCRA).

*V*

In its cross-appeal, McNeil argues that the district court should have imposed sanctions against Hartleip for filing a meritless action. Before its December, 1993 amendment, Fed.R.Civ.P. 11 provided in pertinent part as follows:

The signature of an attorney or party constitutes a certificate by the signer that the signer has read the pleading, motion or other paper; that to the best of the signer's knowledge, information and belief formed after reasonable inquiry it is well grounded in fact and is warranted by existing law or a good faith argument for the extension, modification, or reversal of existing law, and that it is not interposed for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation.

This rule permits a district court to impose sanctions against an attorney or party who has filed and signed a pleading, motion or other paper if the court concludes that it was filed for any improper purpose and it has no basis in law or fact. *Business Guides, Inc. v. Chromatic Communications Enters., Inc.,* 498 U.S. 533, 541–46, 111 S.Ct. 922, 928–31, 112 L.Ed.2d 1140 (1991). The test for the imposition of Rule 11 sanctions is whether the individual's conduct was reasonable under the circumstances. *Mann v. G & G Mfg.,* 900 F.2d 953, 958 (6th Cir.), *cert. denied,* 498 U.S. 959, 111 S.Ct. 387, 112 L.Ed.2d 398 (1990). "The relevant inquiry is whether a specific filing was, if not successful, at least well founded." *Business Guides,* 498 U.S. at 553, 111 S.Ct. at 934. We review a district court's ruling on the imposition of sanctions under Rule 11 for an abuse of discretion. *E.g., Bodenhamer Bldg. Corp. v. Architectural Research Corp.,* 989 F.2d 213, 217 (6th Cir.1993).

As far as we are able to determine, McNeil's sole argument to the district court regarding sanctions consisted of a contention that Hartleip's claims were frivolous, with citation to *Jackson–Colley v. Department of the Army Corps of Eng'rs,* 655 F.Supp. 122, 135–36 (E.D.Mich.1987). McNeil has repeated this argument on appeal, contending that the facts of this case are very similar to those in *Jackson–Colley.*

Considering the arguments presented to the district court regarding why sanctions were appropriate, we conclude that the court did not abuse its discretion in denying McNeil's motion for Rule 11 sanctions. *Jackson–Colley* is not at all similar to this case. In that case, the district court imposed sanctions because it found that the plaintiff, who presented no evidence of discrimination, was merely attempting to re-try an unsuccessful Merit Systems Protection Board claim by challenging the reasons for her termination under the guise of Title VII. In contrast, in this case Hartleip did present some evidence of discrimination in the form of sexual harassment: she presented facts showing that Barnes pursued her, and she asserted theories tying that harassment to the company. Although her legal theories

must be rejected as thinly supported by the facts, we conclude that the denial of sanctions was not an abuse of discretion.

## VI

 McNeil has moved for dismissal of Hartleip's appeal and for an award of fees and costs based upon Hartleip's failure, in violation of Fed. R.App. P. 30(b), to include in the joint appendix certain parts of the record designated by McNeil.[12] Hartleip has offered no explanation for her filing of an improper appendix, and although we certainly do not condone that action, we note that she did file a corrected appendix when ordered by this court to do so. *Cf. United States v. Kush*, 579 F.2d 394, 395 (6th Cir. 1978) (appeal dismissed when appellant failed to file a proper appendix after being ordered to do so). Under the circumstances, we decline to impose the rather harsh sanction of dismissal and, accordingly, we have resolved Hartleip's appeal on the merits. However, we conclude that McNeil is entitled to recover as sanctions its attorneys' fees incurred in preparing a successful motion to strike the original joint appendix, pursuant to 6th Cir. Rule 11(*l*). McNeil may claim these sanctions as costs by including them in its bill of costs, to be filed in the manner provided by Fed. R.App. P. 39(d).

## VII

For the foregoing reasons, we **AFFIRM** the decision of the district court.

---

12. McNeil filed a motion to strike the appendix and dismiss the appeal, requesting fees and costs for filing the motion. Another panel of this court previously granted the motion to strike and ordered Hartleip to refile a corrected appendix. However, that panel referred the motion for dismissal and for costs to this panel for decision.