**Joseph M. MARBLY, Plaintiff,**

**v.**

**HOME PROPERTIES OF NEW YORK, a/k/a The Lakes Apartment Community, Defendant.**

**No. 01–CV–70719.**

United States District Court,
E.D. Michigan,
Southern Division.

April 23, 2002.

Joseph Marbly, Southfield, MI, pro se.

Lee Ravitz, Ravitz & Tucker, Bingham Farms, MI, for defendant.

*OPINION AND ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT*

STEEH, District Judge.

Defendant Home Properties of New York ("HPNY") moves for summary judgment of plaintiff Joseph Marbly's claims that HPNY is liable under 42 U.S.C. §§ 1981 and 1982, and the Fair Housing Act of 1968, 42 U.S.C. § 3601 ("FHA"), for violating plaintiff's civil rights by disproportionately raising his rent under a renewed lease, and denying him rental repairs and maintenance, all on the basis of plaintiff's African–American race. The facts and legal arguments presented in the

parties' briefs are sufficient to adjudicate the motion. Oral argument would not significantly aid the decisional process. Pursuant to E.D. Mich. Local R. 7.1(e)(2), it is ORDERED that the motion be resolved without oral argument. For the reasons set forth below, defendant HPNY's motion for summary judgment will be GRANTED.

## I. Background

The circumstances underlying this lawsuit were set forth in a prior opinion and order denying plaintiff's earlier motion for summary judgment:

Plaintiff alleges in his March 9, 2001 Complaint that he moved into the Lakes Apartments in Southfield, Michigan in January 1999, and that his monthly rent was $745.00. Plaintiff alleges that, in January 2000, he was offered a renewal lease at a rate of $755.00 a month. Plaintiff alleges that nine months later, in October 2000, he received a lease renewal notice that a renewed lease would require $820.00 monthly rent, the same rate charged new tenants. Plaintiff alleges that, upon talking to a few long-time tenants, he discovered that Caucasian tenants' monthly rental rates were not increased to the new $820.00 monthly rate. Plaintiff also alleges that new major appliances such as washers and dryers were delivered to Caucasian tenants, but not to African–American tenants. Plaintiff alleges his complaints about a valve pipe link in his bathroom, broken blinds, a dim or inoperative outside hall light, an intentionally broken building door, and an unkept stairway all went unheeded. Plaintiff alleges the rent increase and unresponsiveness to his complaints constituted illegal discrimination based on his African–American race. Plaintiff seeks an order requiring defendant HPNY to reduce his 2001 lease rate to $765.00 per month and

reimburse plaintiff for any overpayments, and to complete all necessary repairs. Plaintiff also seeks $3.0 million dollars in compensatory damages for pain and suffering, and $4.0 million in punitive damages.

January 10, 2002 Opinion and Order, at 1–2. Plaintiff's motion for summary judgment was denied on the basis that defendant HPNY had proffered legitimate, non-discriminatory reasons for its alleged conduct. *Id.*, at 5–6. The court reasoned that the *McDonnell Douglas* [1] shifting burden analysis applied to plaintiff's discriminatory impact claims as well as his intentional discrimination claims, citing *Soules v. U.S. Dept. of Housing and Urban Development*, 967 F.2d 817 (2d Cir.1992).

## II. Argument

Defendant HPNY now moves for summary judgment arguing that plaintiff cannot produce sufficient evidence to establish a prima facie case of race discrimination, or to dispute the legitimate reasons proffered by HPNY for the alleged disparate treatment. Initially, HPNY refers to plaintiff's deposition testimony in which plaintiff accuses his former employer the Internal Revenue Service ("IRS") of conspiring with or coercing HPNY to discriminate against plaintiff as an African–American. HPNY argues that plaintiff's accusation of IRS involvement is baseless and, alternatively, that proof of IRS influence would not support plaintiff's claim of race discrimination. With respect to plaintiff's lease rate, defendant HPNY proffers evidence that apartment lease rates are a function of when a lease is executed, existing market conditions, and the size and style of a particular apartment. According to evidence produced by HPNY, of the 434 apartment units at the Lakes Apartments complex, 19 units are the same size and style as plaintiff's apartment, with 11 renters paying a higher rental rate than plaintiff, 2 paying the same rental rate, 1 paying less rent, and 4 units being vacant. The evidence proffered by HPNY also indicates that 6 of the 11 tenants that pay higher rent are Caucasian. As to plaintiff's race discrimination claims based on the distribution of washers and dryers, defendant HPNY asserts plaintiff's own deposition testimony supports an undisputable conclusion that, from April 2000 through November 2000, HPNY replaced all 200 washers and dryers supplied by independent contractor "Automatic Apartment Laundry Service" ("AAL"), and replaced them with new laundry equipment purchased by HPNY. HPNY relies on the affidavit of Lakes Apartment Manager Michelle Stamplis attesting that, with the exception of the AAL equipment, HPNY only replaces appliances if they cannot be repaired. As to plaintiff's allegations with respect to his building's state of disrepair, including a broken common access door shared by African–American and Caucasian building tenants, defendant argues the allegation does not support a finding of race discrimination even if proven to be true. Further, Manager Stamplis attests that every repair request made by plaintiff was responded to promptly.

Plaintiff initially counters that summary judgment would be inappropriate because discovery is not yet complete. Plaintiff continues that, to the extent the IRS has influenced defendant HPNY, HPNY may be held liable as a joint tortfeasor co-conspirator. As in his earlier motion for summary judgment, plaintiff emphasizes his theory of discriminatory impact or effect, arguing that he need not prove that HPNY intended to discriminate against

---

1. *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973).

him due to his race. Plaintiff continues that none of the comparative Caucasian tenants referred to by HPNY incurred a $65.00 increase in rent within one year, and that two Caucasian tenants residing in the same size and style apartment as plaintiff's apartment pay less monthly rent than plaintiff. Plaintiff proffers his own affidavit attesting that he: (1) "[w]atched as [HPNY] provided new washers and dryers to white tenants and did not provide the Plaintiff or other black tenants in his building with the new appliances", and; (2) "... would see the cleaning lady clean all other buildings and skip over his."

### III. Standard of Review

Federal Rule of Civil Procedure 56(c) empowers the court to render summary judgment "forthwith if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *See FDIC v. Alexander,* 78 F.3d 1103, 1106 (6th Cir.1996). The Supreme Court has affirmed the court's use of summary judgment as an integral part of the fair and efficient administration of justice. The procedure is not a disfavored procedural shortcut. *Celotex Corp. v. Catrett,* 477 U.S. 317, 327, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *see also Kutrom Corp. v. City of Center Line,* 979 F.2d 1171, 1174 (6th Cir.1992).

The standard for determining whether summary judgment is appropriate is " 'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.' " *Winningham v. North Am. Resources Corp.,* 42 F.3d 981, 984 (6th Cir. 1994) (citing *Booker v. Brown & Williamson Tobacco Co.,* 879 F.2d 1304, 1310 (6th Cir.1989)). The evidence and all inferences arising therefrom must be construed in a light most favorable to the non-moving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Enertech Elec., Inc. v. Mahoning County Comm'r,* 85 F.3d 257, 259 (6th Cir.1996); *Wilson v. Stroh Cos., Inc.,* 952 F.2d 942, 945 (6th Cir.1992). "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *see also Hartleip v. McNeilab, Inc.,* 83 F.3d 767, 774 (6th Cir.1996).

If the movant establishes by use of the material specified in Rule 56(c) that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law, the opposing party must come forward with "specific facts showing that there is a genuine issue for trial." *First Nat'l Bank v. Cities Serv. Co.,* 391 U.S. 253, 270, 88 S.Ct. 1575, 20 L.Ed.2d 569 (1968); *see also Adams v. Philip Morris, Inc.,* 67 F.3d 580, 583 (6th Cir.1995). Mere allegations or denials in the non-movant's pleadings will not meet this burden. *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505. Further, the nonmoving party cannot rest on its pleadings to avoid summary judgment. It must support its claim with some probative evidence. *Kraft v. United States,* 991 F.2d 292, 296 (6th Cir.), *cert. denied,* 510 U.S. 976, 114 S.Ct. 467, 126 L.Ed.2d 419 (1993).

### IV. Analysis

#### A. Applicable Law

A federal housing discrimination claim may be established by proving either disparate treatment and discriminatory intent, or disparate impact. *See Larkin v. State of Michigan Dept. of Social Services,* 89 F.3d 285, 289 (6th Cir.1996).

Federal fair housing law prohibits using impermissible criteria such as race, color, or familial status in real estate transactions. 42 U.S.C. § 3604(a). Other federal anti-discrimination laws confirm that citizens should enjoy equal rights to lease property and enter contracts without regard to race or color. 42 U.S.C. §§ 1981, 1982..... In this Circuit, the same analysis applies to all federal fair housing violations claimed in this case [denial of rental application based on race]. [*Jackson v. Whitehouse*, No. 92–CV–74725–DT, 1993 U.S. Dist. LEXIS 18766, at *14 (E.D. Mich. Nov. 23 1993) ]. All turn on the three-part evidentiary standard first developed in the employment discrimination context by *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). Courts have adapted this test to fair housing claims by requiring the plaintiff to first establish a prima facie case of discrimination. Then, in response, the defendant must offer a legitimate nondiscriminatory reason for the housing decision made. Finally, the plaintiff must show that the proffered reason is a pretext that masks discrimination. *Selden v. United States Dep't of Hous. and Urban Dev.*, 785 F.2d 152, 160 (6th Cir.1986).

*Mencer v. Princeton Square Apts.*, 228 F.3d 631, 634 (6th Cir.2000). A prima facie disparate treatment claim requires the plaintiff to establish that he is a member of a protected class, that he applied for and was qualified to receive a housing benefit, that his application was rejected, and that the property benefit remained available to others. *Id.* at 634.

■■■ In contrast, a prima facie disparate impact claim requires the plaintiff to first demonstrate that an otherwise neutral practice negatively impacts a disproportionate number of blacks. *See Grano v. The Dept. of Development of the City of Columbus*, 637 F.2d 1073, 1081 (6th Cir.

1980) (citing *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 95 S.Ct. 2362, 45 L.Ed.2d 280 (1975) and *Griggs v. Duke Power Co.*, 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971)). If the plaintiff demonstrates that a neutral practice causes a disproportionate disparate impact, the defendant may show that the practice is required by a "business necessity." *Id.* In turn, the plaintiff may rebut the proffered "business necessity" as a mere pretext for discrimination. *Id.*

[S]atisfying the requirements of a prima facie case does not guarantee recovery to a plaintiff. In part to ensure fairness, where a member of a protected group establishes that he was denied housing that remained available, we allow the defendant to explain whether his actions were motivated by impermissible considerations. *Cf. McDonnell Douglas*, 411 U.S. at 800–01, 93 S.Ct. at 1823 (" '[Title VII] does not command that any person be hired ... because he is a member of a minority group.... What is required by Congress is the removal of artificial, arbitrary, and unnecessary barriers ... when the barriers operate invidiously to discriminate on the basis of racial or other impermissible classification.' ") (citation omitted). If, however, the defendant declines the opportunity to present evidence toward this end, the plaintiff is entitled to relief. *See Robinson [v. 12 Lofts Realty*, 610 F.2d 1032, 1039 (2d Cir.1979) ].

If the defendant does come forward with evidence in his defense, we allow a plaintiff an opportunity to show that a defendant's stated reason for denying the plaintiff's application for housing was pretextual. In examining the defendant's reason, we view skeptically subjective rationales concerning why he denied housing to members of protected groups. Our reasoning, in part, is that "clever men may easily conceal their

motivations," *United States v. City of Black Jack,* 508 F.2d 1179, 1185 (8th Cir.1974), *cert. denied,* 422 U.S. 1042, 95 S.Ct. 2656, 45 L.Ed.2d 694 (1975). There is less reason to be wary of subjective explanations, though, where a defendant provides objective evidence indicating that truth lies behind his assertions of nondiscriminatory conduct.

*Soules v. United States Dept. of Housing and Urban Development,* 967 F.2d 817, 822 (2d Cir.1992).

### B. Record Evidence

Plaintiff proffered evidence in his previous motion for summary judgment that supports the information set forth in the following table:

| Name | Monthly Rate | Effective Date | Date Executed |
|---|---|---|---|
| Plaintiff Marbly | $820.00 | January 1, 2001 | November 6, 2000 [2] |
| Lizbeth Better | $775.00 | January 1, 2001 | December 18, 2000 |
| Kimberly Kelly | $815.00 | November 1, 2000 | November 9, 2000 |
| Phillip Funk | $810.00 | Sept 1, 2000 | August 24, 2000 |
| Lawrence Rosenthal | $770.00 | June 11, 2000 | June 30, 2000 |
| Angela Mangiapane | $815.00 | June 1, 2001 | May 4, 2001 |
| Angela Mangiapane | $790.00 | June 1, 2000 | May 22, 2000 |

*See* Plaintiff's October 29, 2001 Exhibits 6–11. The record also contains a table previously proffered by plaintiff titled "THE LAKES APARTMENTS Southfield, MI PROPOSED INCREASES FOR 2001":

| Style | Street Rent as of 2/1/01 | Street Rent as of 5/01/2001 | Total Increase From 2000–2001 |
|---|---|---|---|
| 0A10A | 700.00 | 0.00 | 20.00 |
| 0A10B | 700.00 | 0.00 | 20.00 |
| 1A10A | 820–855 | 830–865 | 40.00 |
| 1A10B | 820–855 | 830–865 | 40.00 |
| 1A10C | 820–855 | 830–865 | 40.00 |
| 1A10D | 820–855 | 830–865 | 40.00 |
| 2A10 | 925–960 | 945–980 | 65.00 |
| 2A10A | 925–960 | 945–980 | 65.00 |
| 2A10B | 925–960 | 945–980 | 65.00 |
| 2A10C | 925–960 | 945–980 | 65.00 |
| 2A10 | 1010–1045 | 1030–1065 | 65.00 |
| 2A10C | 1090–1125 | 1100–1135 | 35.00 |

*See* Plaintiff's October 29, 2001 Exhibit 6B. Plaintiff testified at his deposition that: (1) he was discharged by the IRS on August 6, 1999; (2) the IRS is still following him and tapping his phones; (3) the IRS has made it difficult for plaintiff to secure counsel in prior lawsuits filed against the IRS; (4) plaintiff believes the IRS has influenced defendant HPNY [3]; (4) plaintiff

---

**2.** This was the date, November 6, 2000, plaintiff was offered a renewal lease rate, with his lease set to expire on December 31, 2000. *See* Plaintiff's October 29, 2001 Exhibit 6. Plaintiff responded to Manager Stamplis protesting that a $65.00 rent increase was excessive, warning Stamplis it was against the law to discriminate against persons in renting or leasing an apartment, and threatening to file a complaint with the Fair Housing and Equal Opportunity Commission, and the Michigan Civil Rights Department, if he was not offered

a more reasonable increase of $10.00 to $15.00.

**3.** Plaintiff testified: "[E]very time I would visit the office, your office, the Home Property office, The Lakes Apartment office, it's quite clear the IRS presence was there.

They—I'll just give you an example of what they do just to cause my life misery. One thing they do is clear all women out. So you're basically walking around and you never see any women anytime you walk into a

believes the IRS does not want blacks to live in any suburb; (5) plaintiff believes he had a hard time selling his house due to the IRS; (6) plaintiff believes he has been unable to secure employment since 1999 because of the IRS; (7) plaintiff believes the IRS has been breaking the common door in his apartment building to force him to move from Southfield, Michigan; (8) plaintiff's landlord repaired the broken door within months, but the door was broken again shortly thereafter, and; (9) plaintiff believes HPNY is motivated to treat him poorly by its desire to get rid of IRS influence. Transcript, at 9, 14, 17–18, 20, 22–23, 35, 42. As to the distribution of washers and driers, plaintiff testified:

Q. [by Defense Counsel] You don't know one way or the other whether these individuals requested a new washer or dryer or not; correct?

A. [by Plaintiff] Well, I was told it wasn't based on a request.

Q. Who told you that?

A. The guy—one of the maintenance guys who was working there or directing the -

Q. What was his name?

A. I don't know his name, but he was directing the company who was delivering the washer and dryer.

Q. Was this individual African American or Caucasian?

A. He was African America.

Q. And he told you that they had a policy at the Lakes [Apartments complex] to only replace the washers and driers of Caucasians?

A. No, he didn't say that.

Q. What did he say?

A. He said, as he fumbled with his words to come up with an excuse, he

said that if your washer and dryer had an "AL" or an "AAL", or whatever the company is, then we're going to change that one. If it doesn't, we're not going to change it. Even though I asked them, my washer and dryer is not working too well, it needs to be changed. They said oh, we'll do it, but they never got around to doing it.

Transcript, at 49. Plaintiff admitted that he had no knowledge of the criteria used to replace washers and dryers in the other 30 or so buildings within the Lakes Apartments complex. *Id.*, at 44. Plaintiff also testified that persons named Angela, Liz, Kim and Boimah live in the same building as plaintiff, and that Angela, Liz and Kim are Caucasian while Boimah is African–American. *Id.*, at 40–41. Plaintiff continued that he believed that a majority of the tenants in his building are "minority", with "more than four whites" out of approximately sixteen tenants. *Id.*, at 41–42, 54. Plaintiff testified that all tenants in his building suffered from the broken common door. *Id.*, at 42.

### C. Conclusions of Law

Construing the pleadings and evidence in a light most favorable to plaintiff, plaintiff has failed to meet his evidentiary burden of producing evidence to support his claims of disparate impact or disparate treatment race discrimination, and thus, defendant HPNY is entitled to summary judgment as a matter of law. *Winningham*, 42 F.3d at 984;*First Nat'l Bank*, 391 U.S. at 270, 88 S.Ct. 1575; *Kraft*, 991 F.2d at 296.

room. That's one way of causing pain. Or you got some big fat woman or some other kind of foolishness. So they will change the environment almost anywhere I go, and then the behavior of the people I'm dealing with

would be just like the attorneys. It's quite obvious they're not being themselves." Transcript, at 17, 18, attached as Defendant's Exhibit A.

### i. Disparate Impact

■ Plaintiff has failed to come forward with evidence of a HPNY neutral practice that negatively impacts a disproportionate number of blacks. *Grano*, 637 F.2d at 1081 (and citations therein). Plaintiff himself proffered the schedule of "THE LAKES APARTMENTS Southfield, MI PROPOSED INCREASES FOR 2001" setting forth HPNY's neutral practice of pricing rent based on the "Style" of apartment leased. Plaintiff does not argue or proffer evidence that a disproportionate number of African–Americans occupy the four styles of apartments incurring the highest 2000–2001 monthly rental increase of $65.00. Plaintiff's comparisons of his rental rate to the rental rates secured by Better, Kelly, Funk, Rosenthal and Mangiapane do not support a finding that a disproportionate number of African–Americans are negatively impacted by HPNY's pricing policies; plaintiff is the only African–American involved in the comparison.

■ Likewise, plaintiff has not come forward with specific facts indicating that a disproportionate number of African–Americans are negatively affected by a neutral HPNY repair and/or maintenance practice. *Grano*, 637 F.2d at 1081; *First Nat'l Bank*, 391 U.S. at 270, 88 S.Ct. 1575. Consistent with plaintiff's own deposition testimony, AAL washers and dryers at the Lakes Apartments complex were replaced with new washers and dryers purchased by HPNY. Nothing in the record supports a conclusion that a disproportionate number of African–Americans did not have AAL appliances and thereby did not receive a new washer and drier. Plaintiff has not disputed with evidence Manager Stamplis' attestations that HPNY's policy is to replace only those appliances that cannot be repaired. The evidence construed in a light most favorable to plaintiff does not support a finding that a disproportionate number of African–Americans within the Lakes Complex have a washer and dryer that "is not working too well." Plaintiff's Transcript, at 49. Plaintiff's complaints about the common door not being repaired for months do not evidence a neutral practice, much less a neutral practice having a disproportionate negative impact on African–Americans; the record does not contain evidence that African–American tenants suffer a greater negative impact than other tenants when they are made to wait months for a common door to be repaired.

Plaintiff's attestation that he "would see the cleaning lady clean all other buildings and skip over his" does not, again, support a claim of disparate impact. There is no evidence that the cleaning lady referred to was skipping plaintiff's building pursuant to a neutral HPNY practice. Further, absent evidence of the racial distribution throughout the Lakes Apartments complex, a reasonable jury could not conclude that the cleaning lady's passing by of plaintiff's building negatively and disproportionately impacted African–Americans. Plaintiff's assertions that his complaints about a valve pipe link, broken blinds, a dim or inoperative outside hall light, and an unkept stairway went unheeded simply do not support a finding that HPNY's alleged inattention resulted from a neutral practice that negatively impacted a disproportionate number of blacks. *Grano*, 637 F.2d at 1081 (and citations therein). Indeed, plaintiff has failed to support these claims with specific evidence. *Winningham*, 42 F.3d at 984; *First Nat'l Bank*, 391 U.S. at 270, 88 S.Ct. 1575; *Kraft*, 991 F.2d at 296.

Plaintiff's position throughout these proceedings has been that, by proving that he, an African–American, has been negatively affected, i.e. by not receiving a new washer and dryer, he is entitled to judgment as a matter of law under a disparate impact

theory because he need not prove HPNY acted with discriminatory intent. *See* January 10, 2002 Opinion and Order Denying Plaintiff's Motion For Summary Judgment; February 25, 2002 Order Denying Plaintiff's Motion For Relief From Judgment Under Rule 60(b)(6). While it is accurate to state that proof of unlawful discrimination under a disparate impact theory does not require proof of discriminatory intent, *Grano,* 637 F.2d at 1081 (and citations therein), the plaintiff is required to prove under a disparate impact theory that an otherwise neutral practice impacts a disproportionate number of a minority group. *Id.* Simply proving that the minority plaintiff has been negatively affected not meet that burden. Further, even if plaintiff had produced evidence to support a prima facie disparate impact claim against HPNY, HPNY would still have an opportunity to show consistent with a *McDonnell Douglas* analysis that the neutral practice is required for a business necessity i.e. that economic considerations required HPNY to stop renting appliances from AAL. *See Grano,* 637 F.2d at 1081 (and citations therein); *Soules,* 967 F.2d at 822; *Arthur v. City of Toledo,* 782 F.2d 565, 574–575 (6th Cir.1986) (recognizing that whether an otherwise neutral practice produces an actionable discriminatory impact involves an analysis of the strength of the plaintiff's showing of discriminatory effect, the defendant's interest in taking the action complained of, and the remedy sought by the plaintiff).

Defendant HPNY is entitled to summary judgment of plaintiffs' disparate impact claims as a matter of law in the absence of any evidence to support a finding that a neutral HPNY practice negatively impacts a disproportionate number of African–Americans.

### ii. Disparate Treatment

■ Plaintiff has failed to come forward with sufficient evidence to establish that he was denied housing benefits that were otherwise available to non-minority tenants, or that the legitimate reasons proffered by HPNY for its treatment of plaintiff were a mere pretext for race discrimination. *Mencer,* 228 F.3d at 634. To begin, plaintiff has not come forward with evidence that non-minority tenants of the Lakes Apartments complex received timelier responses to their maintenance or repair requests. Plaintiff's conclusionary attestation that he "would see the cleaning lady clean all other buildings and skip his" falls well short of the specificity of evidence required to oppose HPNY's motion for summary judgment. *First Nat'l Bank,* 391 U.S. at 270, 88 S.Ct. 1575; *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505; *Kraft,* 991 F.2d at 296; Fed.R.Civ.P. 56(e) (requiring affidavit to set forth "specific facts showing there is a genuine issue for trial."). Plaintiff has not specifically alleged or supported with evidence his claims that he was denied timely maintenance with respect to a valve pipe link, broken blinds, a dim or inoperative outside hall light, an unkept stairway or a common door. Further, plaintiff has not come forward with evidence that non-minority tenants were provided timelier maintenance under similar circumstances. There is no evidence in the record that HPNY broke plaintiff's common door. With respect to the denial of his request for a new washer and dryer, plaintiff has not come forward with evidence that non-minority tenants that did not have AAL appliances, and whose appliances were "not working too well", received new washers and driers.

Plaintiff's remaining disparate treatment claim is based on a comparison of the monthly rental rates paid by himself ($820.00), Better ($775.00), Kelly ($815.00), Funk ($810.00), Rosenthal ($770.00) and Mangiapane ($815.00). Plaintiff does not dispute Manager Stamplis' attestation that Better received a $775.00 monthly rate by

mistake, and that when informed of the mistake, Better vacated her apartment within 60 days. Stamplis January 23, 2002 Affidavit, ¶ 7(D), at 3. Plaintiff has also failed to come forward with evidence to dispute as pretextual Stamplis' explanation that tenants Funk, Rosenthal, and Mangiapane received lower monthly lease rates due to the timing of the execution and effective dates of their leases. Funk, Rosenthal and Mangiapane executed their leases, respectively, approximately two months, four months and nearly six months before plaintiff was offered a renewal lease rate of $820.00 per month on November 6, 2000, and their lease rates became effective, respectively, four months, six months and six months before plaintiff's monthly lease rate took effect on or about January 1, 2001.

The evidence does indicate that tenant Kimberly Kelly executed a new lease on November 9, 2000, effective November 1, 2000, charging a monthly rate of $815.00, whereas plaintiff was offered a lease rate of $820.00 on November 6, 2000 effective January 1, 2001. Stamplis' explanation that Kelly's monthly lease rate was $5.00 lower than the $820.00 rate offered to plaintiff on November 6, 2000, three days before Kelly executed her lease on November 9, 2000, does not explain why plaintiff was not offered the same retroactive $815.00 monthly rate as was offered to Kelly. Plaintiff himself, however, proffered evidence that, on November 11, 2000, he countered the $820.00 monthly lease offer with "a more reasonable new lease agreement increase, say $10 to $15, [or] I will file a complaint(s) with the Fair Housing and Equal Opportunity Commission, and with the Michigan Civil Rights Department." Plaintiff's October 29, 2001 Exhibit 6. Plaintiff's counteroffer of a $10.00 to $15.00 monthly increase equated to a counteroffer of a $770.00 monthly

lease rate.[4] Plaintiff indeed filed a complaint with the U.S. Department of Housing and Urban Development on November 18, 2000 stating he believed he was a victim of housing discrimination based on race:

> The IRS, or many employees of the IRS, doesn't [sic] believe *blacks* should live in any suburb. So through intimidation they have co-erced [sic] Home Properties to try and force me out by discriminatorily [sic] increasing my rent.

Defendant's January 29, 2002 Exhibit A (emphasis in original).

To succeed on his disparate treatment claim, plaintiff was required to come forward with evidence that he was treated differently than "similarly situated" tenants.

> "[T]he plaintiff must show that the 'comparables' are similarly situated in all respects. Thus, to be deemed 'similarly-situated,' the individuals with whom the plaintiff seeks to compare his/her treatment must have dealt with the same supervisor, have been subject to the same standards and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 583 (6th Cir.1992) (citations omitted).

*Jackson v. Huron Development Ltd. Partnership*, No. 98–2356, 2000 WL 282482, at *4 (6th Cir. March 9, 2000) (applying standards of Title VII race discrimination in employment case to federal fair housing claims). Plaintiff has failed to produce evidence that Funk, Rosenthal, and Mangiapane were subject to the same 2001 lease rate increase when they executed their leases two to six months before plaintiff. It is beyond reasonable dispute that

4. $820.00 lease − $65.00 alleged increase + $15.00 offered increase = $770.00 offer.

**746**

plaintiff's counteroffer and threats of legal action distinguished his circumstances from those faced by Kelly; plaintiff has not come forward with evidence that he and Kelly were similarly situated in all respects. *Id.*, at *4. Plaintiff' general allegation that new Caucasian tenants rates were not increased is without support considering Stamplis' unchallenged attestation that 6 of 11 tenants residing in an apartment similar in style to plaintiff's apartment are Caucasian and pay a higher rent than plaintiff. Stamplis January 23, 2002 Affidavit, ¶¶ 8–9, at 3.

The record does not support, as plaintiff believes, that the IRS was in anyway involved in the activities of defendant HPNY. Although the court does not agree with HPNY that the absence of evidence of IRS involvement translates into an absence of evidence of discriminatory intent, plaintiff's unsupported assertions of IRS involvement do not support an actionable disparate treatment claim. Construing the pleadings and evidence in a light most favorable to HPNY, HPNY is entitled to summary judgment of plaintiff's disparate treatment claims as a matter of law.

### iii. Discovery

Plaintiff's argument that discovery remains pending is not supported by the record. Further, plaintiff has not filed a Rule 56(f) affidavit. *See* Fed.R.Civ.P. 56(f).

### V. Conclusion

For the reasons set forth above, defendant HPNY's motion for summary judgment is hereby GRANTED. Plaintiff Joseph Marbly's claims are hereby DISMISSED with prejudice in their entirety.

SO ORDERED.